Nos. 25-1705, 25-1706

IN THE

# United States Court of Appeals
# for the First Circuit

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

*Plaintiffs-Appellees,*

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the
Maine Commission on Governmental Ethics and Election Practices; DAVID
R. HASTINGS, III, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices; DENNIS
MARBLE, in the official capacity as a Member of the Maine Commission on
Governmental Ethics and Election Practices; BETH N. AHEARN, in the
official capacity as a Member of the Maine Commission on Governmental
Ethics and Election Practices; AARON M. FREY, in the official capacity as
Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as
a Member of the Maine Commission on Governmental Ethics and Election
Practices,

*Defendants-Appellants,*

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK;
RICHARD A. BENNETT,

*Defendants.*

———————————————

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

*Plaintiffs-Appellees,*

v.

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK;
RICHARD A. BENNETT,

*Defendants-Appellants,*

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the
Maine Commission on Governmental Ethics and Election Practices; DAVID
R. HASTINGS, III, in the official capacity as a Member of the Maine

Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

*Defendants.*

_____

On Appeal from the United States District Court
for the District of Maine
No. 1:24-cv-00430-KFW (Karen Frink Wolf, J.)

---

**OPENING BRIEF FOR DEFENDANTS-APPELLANTS EQUAL CITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A. BENNETT**

---

Neal Kumar Katyal
Colleen E. Roh Sinzdak
Jessica C. Huang
Samantha K. Ilagan
Milbank LLP
1101 New York Ave. NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

October 22, 2025

*Counsel for Defendants-Appellants Equal Citizens, Cara McCormick, Peter McCormick, Richard A. Bennett*

## DISCLOSURE STATEMENT

Equal Citizens Foundation ("Equal Citizens") discloses that it is a non-governmental entity in which no parent corporation, other entity, or person has a greater than 10% interest.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT..................................................................7

STATEMENT OF THE ISSUES......................................................................7

STATEMENT OF THE CASE ........................................................................ 8

    A.    Factual Background........................................................ 8

    B.    Procedural History ......................................................10

SUMMARY OF ARGUMENT ......................................................................15

STANDARD OF REVIEW .......................................................................... 20

ARGUMENT ............................................................................................ 20

I.    THE ACT'S CONTRIBUTION LIMIT COMPORTS WITH THE
FIRST AMENDMENT ...................................................................... 20

    A.    *Buckley* And *Citizens United* Establish A
Clear Line Between Permissible Contribution
Limits And Impermissible Limits On
Independent Expenditures.........................................21

    B.    Under This Framework, The Act's Contribution
Limit Is Constitutional ............................................. 27

    C.    The Arguments To The Contrary Lack Merit............................ 35

II.    THE ORIGINAL MEANING OF THE FIRST AMENDMENT
CONFIRMS THE CONSTITUTIONALITY OF THE
CONTRIBUTION LIMIT .................................................................. 39

    A.    The Original Meaning Of The First Amendment
Would Not Restrict The Legislature Or The
People From Policing Contributions To Political
Action Committees ................................................... 43

**TABLE OF CONTENTS—Continued**

B.    The Regulation Of Dependence Corruption Is A "Sufficiently Important Interest" To Sustain Maine's Law .............................................................. 45

III.    THE ACT'S DISCLOSURE REQUIREMENT IS INDEPENDENTLY PERMISSIBLE ................................................. 55

CONCLUSION ............................................................ 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:**                                                                 Page(s)

*Alaska Pub. Offs. Comm. v. Patrick,*
    494 P.3d 53 (Alaska 2021) ................................................................ 4, 5

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ............................................................. 56, 57

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
    564 U.S. 721 (2011) .................................................... 26, 27, 31

*Asociación de Educación Privada de P.R., Inc. v. Garcia-Padilla,*
    490 F.3d 1 (1st Cir. 2007) ............................................................ 20

*Biden v. Knight First Amend. Inst. at Colum. Univ.,*
    141 S. Ct. 1220 (2021) ................................. 17, 18, 40, 41, 43, 44

*Brown v. Socialist Workers '74 Campaign Comm'n (Ohio),*
    459 U.S. 87 (1982) ............................................................. 58, 61

*Buckley v. Am. Const. L. Found., Inc.,*
    525 U.S. 182 (1999) ...................................................................... 55

*Buckley v. Valeo,*
    424 U.S. 1 (1976) (per curiam) .............................. 2, 14, 15, 16, 19, 20, 21,
                                    22, 23, 24, 25, 27, 34, 35,
                                    41, 42, 55, 57, 60, 61, 62

*Cal. Bankers Ass'n v. Schultz,*
    416 U.S. 21 (1974) ........................................................................ 61

*Cal. Med. Ass'n v. FEC,*
    453 U.S. 182 (1981) ...................................................................... 34

*Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley,*
    454 U.S. 290 (1981) ...................................................................... 61

# TABLE OF AUTHORITIES—Continued

Page(s)

*Citizens United v. FEC,*
  558 U.S. 310 (2010) .............................................. 1, 2, 11, 12, 13, 14, 15, 16,
      17, 18, 23, 25, 26, 27, 28, 31,
      32, 36, 37, 56, 57, 58, 62

*Crawford v. Washington,*
  541 U.S. 36 (2004) ....................................................................... 39, 40

*Daggett v. Comm'n on Governmental Ethics & Election Pracs.,*
  205 F.3d 445 (1st Cir. 2000) ...................................................... 55, 56, 57

*Davis v. FEC,*
  554 U.S. 724 (2008) ....................................................................... 27

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ...................................................................... 39, 40

*Doe v. Reed,*
  561 U.S. 186 (2010) ...................................................................... 55, 57

*FEC v. Cruz,*
  596 U.S. 289 (2022) ............................................................ 13, 14, 41, 42

*FEC v. Nat'l Right to Work Comm'n,*
  459 U.S. 197 (1982) ....................................................................... 2

*First Nat'l Bank of Bos. v. Bellotti,*
  435 U.S. 765 (1978) .................................................................. 25, 26, 57

*Gaspee Project v. Mederos,*
  13 F.4th 79 (1st Cir. 2021) ................................................. 18, 55, 56, 57, 58

*Long Beach Area Chamber of Com. v. City of Long Beach,*
  603 F.3d 684 (9th Cir. 2010) ................................................................ 38

*McConnell v. FEC,*
  251 F. Supp. 2d 176 (D.D.C. 2003) ........................................................ 26

v

## TABLE OF AUTHORITIES—Continued

Page(s)

*McConnell v. FEC,*
540 U.S. 93 (2003) ............................................................. 27, 31

*McCutcheon v. FEC,*
572 U.S. 185 (2014) ................................................................ 22

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) ............................................... 49, 50, 53, 54

*McKee v. Cosby,*
586 U.S. 1172 (2019) .............................................................. 43

*Michael H. v. Gerald D.,*
491 U.S. 110 (1989) ........................................................... 45, 46

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
458 U.S. 50 (1982) .................................................................. 53

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022) ............................................................... 39, 40

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ................................................................ 53

*Nat'l Org. for Marriage v. Daluz,*
654 F.3d 115 (1st Cir. 2011) .................................................... 55

*Nat'l Org. for Marriage, Inc. v. McKee,*
669 F.3d 34 (1st Cir. 2012) ..................................................... 55

*Nixon v. Shrink Mo. Gov't PAC,*
528 U.S. 377 (2000) ......................................................... 2, 34, 35

*Or. Socialist Workers 1974 Campaign Comm'n v. Paulus,*
432 F. Supp. 1255 (D. Or. 1977) .............................................. 61

*Parker v. District of Columbia,*
478 F.3d 370 (D.C. Cir. 2007) ................................................. 40

## TABLE OF AUTHORITIES—Continued

Page(s)

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) .................................................................. 44

*SpeechNow.org v. FEC,*
599 F.3d 686 (D.C. Cir. 2010) (en banc) .............................. 4, 5, 12, 32, 38

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
732 F.3d 535 (5th Cir. 2013) .................................................. 38

*United States v. Householder,*
No. 1:20-CR-77, 2023 WL 24090 (S.D. Ohio Jan. 3, 2023) .................. 33

*United States v. Lindberg,*
No. 19-CR-22, 2020 WL 520948 (W.D.N.C. Jan. 31, 2020) .................. 33

*United States v. Menendez,*
132 F. Supp. 3d 635 (D.N.J. 2015) .......................................... 32

*United States v. Rahimi,*
602 U.S. 680 (2024) ........................................... 39, 40, 49, 50, 53

*United States v. UAW-CIO,*
352 U.S. 567 (1957) .............................................................. 54

*Vote Choice, Inc. v. DiStefano,*
4 F.3d 26 (1st Cir. 1993) ........................................... 6, 19, 58, 59

*Wesberry v. Sanders,*
376 U.S. 1 (1964) .................................................................. 47

*Wis. Right to Life State Pol. Action Comm. v. Barland,*
664 F.3d 139 (7th Cir. 2011) .................................................. 4, 5

**CONSTITUTION:**

U.S. CONST. art. I, § 2, cl. 2 .................................................... 52

U.S. CONST. art. I, § 2, cl. 3 .................................................... 52

## TABLE OF AUTHORITIES—Continued

Page(s)

U.S. CONST. art. I, § 3, cl. 3.................................................................. 52

U.S. CONST. art. I, § 6, cl. 2 ................................................................. 50

U.S. CONST. art. II, § 1, cl. 5................................................................. 52

**STATUTES:**

28 U.S.C. § 1291 ....................................................................................7

28 U.S.C. § 1331 ....................................................................................7

42 U.S.C. § 1983 ....................................................................................7

52 U.S.C. § 30109(d) ....................................................................... 28, 29

52 U.S.C. § 30116 ........................................................................... 28, 29

52 U.S.C. § 30118 ........................................................................... 28, 29

52 U.S.C. § 30125(e) ....................................................................... 29, 30

ME. STAT. tit. 21-A:

    § 1004.......................................................................................... 29

    § 1015(2-C).................................................................................. 8, 9

    § 1015(2-D).................................................................................. 8, 9

    § 1015(4).................................................................................. 29, 30

    § 1015(5).................................................................................. 28, 29

    § 1017(5).................................................................................. 59, 60

    § 1019-B(1) ................................................................................... 8

    § 1019-B(4)(B)............................................................................. 8, 9

## TABLE OF AUTHORITIES—Continued

Page(s)

§ 1019-B(6)....................................................................... 8

REGULATION:

11 C.F.R. § 109.21 .......................................................... 28, 29

OTHER AUTHORITIES:

David Robertson, *Debates and Other Proceedings of the
    Convention of Virginia* (2d ed. 1805) ................................ 48, 49

*Debates in the Several State Conventions on the Adoption of
    the Federal Constitution* (Jonathan Elliot ed., 1836) ............. 52

*Fundraising for Super PACs by Federal Candidates*, Fed.
    Election Comm'n, https://www.fec.gov/help-candidates-
    and-committees/making-disbursements-pac/fundraising-
    super-pacs-federal-candidates-nonconnected-pac (last
    visited Oct. 22, 2025)....................................................... 29, 30

Gordon S. Wood, *The Creation of the American Republic 1776-
    1787* (1998)................................................................... 47

Lawrence Lessig, *Republic, Lost: How Money Corrupts
    Congress—and a Plan to Stop It* (2011)................................ 49

Lawrence Lessig, *What an Originalist Would Understand
    "Corruption" to Mean*, 102 CALIF. L. REV. 1 (2014)................. 46

*Records of the Federal Convention of 1787* (Max Farrand ed.,
    1911) .......................................................................... 50, 51, 52

THE FEDERALIST (Clinton Rossiter ed., 1961):

    NO. 39 (James Madison) ................................................. 48, 49

    NO. 41 (James Madison).................................................. 51

## TABLE OF AUTHORITIES—Continued

Page(s)

No. 52 (James Madison) .............................................. 5, 41, 45, 49, 50, 51

No. 57 (James Madison) ............................................................41, 45, 48

Zephyr Teachout, *Corruption in America: From Benjamin Franklin's Snuff Box to* Citizens United (2014) .........46, 47, 48, 49, 51, 54

## INTRODUCTION

In 2024, the citizens of Maine voted overwhelmingly in favor of a ballot initiative that imposes common-sense regulations on contributions to entities that make the independent expenditures that increasingly shape Maine's elections—commonly referred to as SuperPACs. The ballot initiative, entitled "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures," passed with 74.9% of the vote. More people voted for the Act than for any candidate or issue in the State's history.

The Act establishes a $5,000 cap on contributions to entities that make independent expenditures, thereby preventing the occurrence and appearance of quid pro quo corruption that arises when donors are permitted to make unlimited, large-value donations to a candidate's favored SuperPAC. The Act also imposes a requirement for a SuperPAC to disclose its donors when it makes independent expenditures over $250 for a particular candidate's campaign, ensuring that Maine voters know where the money driving their elections is coming from.

The District Court imposed a permanent injunction against these requirements. In doing so, it did not dispute the evidence of the Act's sponsors that large SuperPAC donations give rise to quid pro quo corruption; rather, it held that the Supreme Court's decision in *Citizens United v. FEC*,

558 U.S. 310 (2010), required holding that the State's interest in preventing such corruption was not strong enough to withstand constitutional scrutiny.

That was error. In *Citizens United*, the Supreme Court invalidated limits on corporations' independent expenditures (like ad buys to support a candidate) because those expenditures are not coordinated with a candidate and therefore, "[b]y definition," cannot create a corrupt quid pro quo deal. *Id*. at 360. But contributions to a SuperPAC *can be* coordinated and therefore *can be* the product of a quid pro quo deal. And nothing in *Citizens United* or in any subsequent Supreme Court case disturbs the longstanding precedent securing to the people the power to prevent quid pro quo corruption or its appearance by limiting the size of contributions. *E.g.*, *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976) (per curiam); *FEC v. Nat'l Right to Work Comm'n*, 459 U.S. 197, 208 (1982); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 397 (2000).

Indeed, the District Court's decision is particularly remarkable because it is the first federal court to hold that "even accepting" that a limit on SuperPAC contributions can serve the State's interest in combatting quid pro quo corruption, such a limit is still unconstitutional simply because expenditure limits are impermissible under *Citizens United*. JA 354. The District Court therefore held that there can be quid pro quo corruption

2

infecting our election processes, but that the people are powerless to address it. That is not the law.

The District Court's error flowed from its ignoring the fundamental distinction between unconstitutional limits on *independent expenditures* and constitutional limits on *contributions*. Independent expenditures cannot give rise to quid pro quo corruption because they do not involve *any* coordination with a candidate, thus eliminating the possibility of permissible coordination turning into unlawful corruption. (Indeed, if there were impermissible coordination, independent expenditures that exceed the contribution limits would become *illegal* contributions subject to civil and even criminal penalties.) But there is no comparable restriction on coordination between candidates and SuperPAC donors, nor could there be any feasible or effective bar on such coordination or fundraising communications between a candidate and his supporters. The two situations are thus completely different: in one, there is a bar on coordination, minimizing any risk of quid pro quo corruption. In the other, there is and could be no bar, plainly creating the very risk of corruption that every Supreme Court case since *Buckley* has confirmed the people are free to address—through limits on the size of contributions.

Nonetheless, the District Court denied the people of Maine the freedom to address such corruption because it read *Citizens United* to hold— as a matter of law—that any risk of corruption from an independent expenditure was less than the risk from a direct contribution to a candidate or his campaign. Thus, the District Court reasoned, the risk of corruption from a contribution to an independent political action committee, being "one step further removed from the candidate," must create even less of a risk. JA 353.

This reasoning fundamentally misunderstands *Citizens United* and is obviously wrong. There can be no real dispute that the risk of corruption from a $10 million dollar contribution to a SuperPAC presents at least as high a threat of corruption as a $10,000 donation directly to a campaign. Because the Supreme Court has upheld contribution limits that prevent the $10,000 direct donation, limits that prevent the $10 million SuperPAC donation must be constitutional too. Indeed, the briefing and record in this case contain ample evidence of the very real threat of quid pro quo corruption that attends large SuperPAC contributions.

The District Court grounded its conclusion on a number of other lower federal-court decisions that have struck down limits on contributions to independent political action committees. *See, e.g.*, *SpeechNow.org v. FEC*,

599 F.3d 686 (D.C. Cir. 2010) (en banc); *Wis. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139 (7th Cir. 2011); *Alaska Pub. Offs. Comm. v. Patrick*, 494 P.3d 53 (Alaska 2021). But every one of those decisions was premised on the erroneous assumption that contributions to independent political action committees cannot create a risk of quid pro quo corruption. The District Court did not dispute that the evidence in this case establishes that large contributions to SuperPACs can and do give rise to the appearance and occurrence of quid pro quo corruption. Until the decision below, no court had ever immunized a practice that they assumed could create a risk of quid pro quo corruption from regulation.

Reversing the District Court's decision is also consistent with the original meaning of the First Amendment. That is so both because (1) the Act was adopted by almost 75% of Maine voters as a means of advancing an obvious public good, and (2) the Act prevents "dependence corruption," JA 355, which occurs when politicians are not, as James Madison put it, "dependent on the people alone," THE FEDERALIST NO. 52, at 326 (James Madison) (Clinton Rossiter ed., 1961). The historical evidence shows that the Framers' intention to prevent corruption that gives rise to improper dependence was at least as strong as their desire to prevent quid pro quo corruption. And nothing in the original meaning of the First Amendment or

in the Framers' intent blocks Maine's voters from seeking to avoid a democracy where the representatives are focused on their funders first, rather than on the people.

The Act's disclosure requirement, too, serves a vitally important interest in ensuring that voters know the source of the money that fuels their elections. The District Court acknowledged as much, striking down the disclosure requirement only because it believed the requirement was insufficiently tailored to this important interest because it lacked an exemption for small-value donors. But that holding disregards the precedent of this Court, which recognizes that such an exemption is not necessary unless the context demands it. *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 31-33 (1st Cir. 1993). Here, because Maine is a small state where even small donations can make a large difference, and because the disclosure requirement already has a $250 independent-expenditure trigger, no exemption is necessary.

This Court should therefore reverse the District Court's erroneous decision and lift the injunction that is preventing the enforcement of a law that is consistent with the longstanding jurisprudence of the Supreme Court and supported by the vast majority of Maine voters as vital to improving the integrity of Maine elections.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the federal constitutional questions presented in this appeal under 28 U.S.C. § 1331. Those questions arise under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291. Magistrate Judge Karen Frink Wolf granted Plaintiffs Dinner Table Action, For Our Future, and Alex Titcomb's Motion for Permanent Injunction on July 15, 2025 and entered Final Judgment in favor of Plaintiffs on the same day. Defendants William J. Schneider; David R. Hastings, III; Dennis Marble; Beth N. Ahearn; Aaron M. Frey; Sarah E. Leclaire; Equal Citizens; Cara McCormick; Peter McCormick; and Richard A. Bennett timely filed notices of appeal on July 24, 2025.

## STATEMENT OF THE ISSUES

**1.** Whether the Maine Act's limit on contributions to SuperPACs complies with the First Amendment.

**2.** Whether the Maine Act's disclosure requirement complies with the First Amendment.

## STATEMENT OF THE CASE

### A.    Factual Background

In November 2024, the Maine electorate overwhelmingly voted to adopt a ballot initiative imposing a contribution limit and disclosure requirement on SuperPACs—political action committees that make independent expenditures.[1] The Act, entitled "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures," establishes a $5,000 annual limit on contributions by an entity or individual

---

[1] Maine law defines an "independent expenditure" as "any expenditure made by a person, party committee or political action committee that is not made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized political committee or an agent of either"; and that (1) "[i]s made to design, produce or disseminate any public communication that expressly advocates the election or defeat of a clearly identified candidate"; or (2) "[u]nless the person, party committee or political action committee making the expenditure demonstrates . . . that the expenditure did not have a purpose or effect of influencing the nomination, election or defeat of the candidate," is made "to design, produce or disseminate a public communication that names or depicts a clearly identified candidate and is disseminated during the 28 days, including election day, before a primary election; during the 35 days, including election day, before a special election; or from Labor Day to a general election." ME. STAT. tit. 21-A, § 1019-B(1). Unlike federal law, Maine law does not require that political action committees that make independent expenditures be completely separate from committees that make direct or coordinated expenditures. The Act thus limits the size of contributions to "political action committees" (but not "party committee[s]") made "for the purpose of making independent expenditures," and requires political action committees making independent expenditures to account for the source of the funds used. *Id.* §§ 1015(2-C), 1015(2-D), 1019-B(4)(B), 1019-B(6). But for convenience, we refer to the limits of the Act as limits on contributions to "SuperPACs."

"for the purpose of making independent expenditures" supporting or opposing a specific candidate. ME. STAT. tit. 21-A, § 1015(2-C), (2-D). A separate provision requires an individual or entity "that makes any independent expenditure in excess of $250 during any one candidate's election" to disclose the identity of each contributor who funded the independent expenditure. *Id.* § 1019-B(4)(B).

The Act was proposed by Defendants Equal Citizens, Cara McCormick, Peter McCormick, and State Senator Richard A. Bennett to remedy the palpable risk of corruption posed by large, often untraceable, contributions to SuperPACs that increasingly fund electioneering in Maine. As Senator Bennett explained, over the last decade and a half, "the electoral landscape" in his State has "change[d]," as "[l]arge political action committees, or SuperPACs" have begun to "invest heavily in Maine elections." JA 43.

In Senator Bennett's "experience as a candidate and as a state legislator," the "anonymous, unregulated contributions" that SuperPACs receive "create an appearance of corruption, because they create a risk that politicians who benefit from these SuperPACs" will be "beholden" to them and "will engage in quid pro quo corruption." JA 43. In his view, "Maine citizens are discouraged from donating to candidates, participating in political campaigns, and even from voting, because they do not wish to

participate in a system that they believe is corrupt, or at a minimum, appears to be corrupt." JA 43-44.

Another of the Act's initiators, Cara McCormick, has explained that—like many Maine voters—she has become "discouraged and disheartened by the influence of SuperPACs" funded by large, anonymous, and often out-of-state donors. JA 48. She helped work to get the Act passed because she believes "[t]hese unrelated, anonymous donations give rise to corruption, or the appearance of corruption, between the donor and the politician whom the SuperPAC supports." JA 49. She explains that, "[w]ithout knowledge of who these donors are, we cannot protect the integrity of our political process." JA 49.

The Maine Act passed as a ballot initiative with the support of 74.9% of Mainers. JA 51. The Act "received more votes, 600,191, than any citizens' initiative or politician has ever received in any election in the history of the State of Maine." JA 51.

## B.    Procedural History

On December 13, 2024, two SuperPACs known as Dinner Table Action and For Our Future, as well as their founder Alex Titcomb, brought suit against the Maine state officials charged with enforcing the Act, alleging that its contribution limit and disclosure requirement violate the Constitution. A

month later, Plaintiffs filed a motion to permanently enjoin the challenged provisions of the Act. A group of the Act's sponsors and proponents—State Senator Richard A. Bennett, Cara and Peter McCormick, and the fair election organization Equal Citizens (together, "Equal Citizens")—intervened to join the Maine officials in defending the Act.

The District Court granted Plaintiffs' request for a permanent injunction against both the contribution limit and the disclosure requirement. *See* JA 346-360.[2]

The District Court began by characterizing the "primary question in this case" as "whether Maine's recently enacted law limiting contributions to political action committees (PACs) that make independent expenditures . . . is a constitutional means of preventing quid pro quo corruption." JA 346. The court answered that question in the negative, holding that "regardless of whether strict or intermediate scrutiny applies," the Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), "forecloses limits on contributions to independent expenditure groups." JA 355.

---

[2] At the parties' consent, the case was heard before a magistrate judge. *See* JA 346 n.1.

In reaching that conclusion, the District Court explained that the only state interest the Supreme Court has found "to outweigh the First Amendment's political speech protections is the state's interest in preventing quid pro quo corruption." JA 349. And it observed that *Citizens United* had held that limits on independent expenditures themselves are unconstitutional because they "do not give rise to corruption or the appearance of corruption." JA 349 (quoting 558 U.S. at 357).

The District Court then recognized that the First Circuit has not addressed whether *Citizens United*'s holding should be extended to invalidate limits on contributions to SuperPACs as well. JA 350. But it was persuaded by a series of out-of-circuit decisions—like *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc)—that have extended *Citizens United* in this way based on the view that, if independent expenditures cannot give rise to quid pro quo corruption, then donations to organizations that make independent expenditures cannot give rise to such corruption either. JA 350.

The District Court acknowledged that, here, Equal Citizens had pointed to criminal cases involving "political candidates and contributors allegedly using a Super PAC to further illegal quid pro quo arrangements." JA 352 (quotation marks and citation omitted). But the court found that,

12

"[e]ven accepting that contributions to independent expenditure PACs can serve as the quid in a quid pro quo arrangement," the contribution limit is still unconstitutional under *Citizens United*. JA 352. The court explained that it did not "read" that case "as suggesting that independent expenditures are wholly incorruptible, but rather that they are sufficiently removed from the candidate so that the danger of such corruption is 'substantially diminished' to the point that the government's 'anticorruption interest is not sufficient to displace' First Amendment protections." JA 353 (quoting *Citizens United*, 558 U.S. at 357). And the court reasoned that because "contributions to independent expenditures are one step further removed from the candidate, the logic of *Citizens United* dictates that the danger of corruption is smaller still" with respect to contributions to SuperPACs, meaning the Act's contribution limit must be unconstitutional. JA 353.

The District Court also rejected Equal Citizens's additional argument that the Act should be upheld based on principles of originalism, including that the Act serves a compelling interest in combatting "dependence corruption," which the Founders of our Republic viewed as anathema to our democracy. JA 355. The court stated that "the Supreme Court has been clear that the only interest it recognizes as sufficient to justify limits on political

speech is the government's interest in preventing quid pro quo corruption." JA 355 (citing *FEC v. Cruz*, 596 U.S. 289, 305 (2022)).

Finally, the District Court invalidated the Act's disclosure requirement, JA 357-359, rejecting Equal Citizens's contention that the requirement is independently permissible based on Supreme Court precedent establishing the constitutionality of disclosure laws designed to achieve transparency in the campaign-finance process. *See Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976) (per curiam).

The District Court acknowledged that "the Supreme Court has said that the government has an important interest 'in provid[ing] the electorate with information and insur[ing] that the voters are fully informed about the person or group who is speaking.'" JA 357-358 (quoting *Citizens United*, 558 U.S. at 368) (alterations in original). But the court concluded that the Act's disclosure requirement is not "narrowly tailored to Maine's informational interest" because, in the court's view, the disclosure requirement is too broad and "provides no meaningful opportunity for anonymous contributions." JA 359.

Based on this merits analysis and its finding that the other permanent-injunction factors were satisfied, the District Court granted Plaintiffs'

request to permanently enjoin the enforcement of the Act's contribution limit and disclosure requirement. JA 360.

Maine and Equal Citizens separately appealed to the First Circuit, and the two cases have been consolidated on appeal.

## SUMMARY OF ARGUMENT

**I.A.** The Act's contribution limit comports with the First Amendment because it is closely drawn to address Maine's compelling interest in preventing the occurrence and appearance of quid pro quo corruption. *Citizens United v. FEC*, 558 U.S. 310 (2010), is not to the contrary because, while that case held that independent expenditures do not themselves give rise to quid pro quo corruption, it affirmed the well-established principle that limits on contributions may be a constitutional means of preventing quid pro quo corruption or the appearance of quid pro quo corruption. As the Supreme Court first explained in *Buckley v. Valeo*, the possibility that candidates will exchange political favors for large contributions means that contribution caps may be justified as a means of combatting that quid pro quo corruption. 424 U.S. 1, 26-27 (1976) (per curiam). But the same danger does not attend independent expenditures because "*[b]y definition*," they are "not coordinated with a candidate," *Citizens United*, 558 U.S. at 360

(emphasis added); *see Buckley*, 424 U.S. at 46-47, and because they are "not coordinated," they present no opportunity for a quid pro quo agreement.

**B.** Under this controlling framework, the Act's limit on contributions to SuperPACs is constitutional because contributions need not be "independent"; candidates are permitted to solicit donations to SuperPACs, and there is no practical means through which such fundraising communications could be barred. That means that—as with other forms of campaign contributions—there is a possibility of quid pro quo agreements, and with large contributions, that possibility is significant. Equal Citizens has demonstrated as much. It has pointed to a number of cases involving allegations of candidates accepting bribes in the form of contributions to SuperPACs. And its expert presented evidence to the District Court that the public believes that the risk of quid pro quo corruption is very high when SuperPACs accept donations over $5,000.

**C.** The District Court and the courts of appeals that have held that limits on contributions to SuperPACs are unconstitutional have all done so based on a plain misreading of *Citizens United*. For its part, the District Court mistakenly held that *Citizens United* recognized that independent expenditures could give rise to corruption and that the Supreme Court had merely found that risk too low to justify limits. That is plain error. The

Supreme Court unmistakably held that independent expenditures do not give rise to any quid pro quo corruption. The District Court—like the courts of appeals it sided with—disregarded the fundamental distinction between independent expenditures and the contributions to entities that make such expenditures: that such expenditures are "by definition" independent and therefore incapable of giving rise to quid pro quo corruption, *Citizens United*, 558 U.S. at 360, while contributions may be coordinated, and thus *can* give rise to the sort of political quid pro quos that have long justified contribution limits.

**II.** Basic principles of originalism reinforce the constitutionality of the Act's contribution limit in at least two ways. To date, the Supreme Court has not addressed how principles of originalism should apply to campaign-finance regulations. Thus, while this Court cannot rely exclusively on these principles to the extent they conflict with the Supreme Court's current framework for assessing the constitutionality of campaign-financing restrictions, it is appropriate for this Court to identify how they support the constitutionality of Maine's initiative and provide further evidence that the District Court erred in invalidating the Act.

**A.** First, as Justice Thomas has explained, any regulations that would have been permissible at the Founding are valid under the First Amendment.

17

*See Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220, 1223-24 (2021) (Thomas, J., concurring). Equal Citizens has submitted an expert declaration establishing that the Framers would not have found a regulation of speech unconstitutional if it was adopted by the people through a representative process as a means of advancing the public good. The Act, which was adopted by a ballot initiative supported by almost 75% of Maine voters, plainly satisfies those requirements.

**B.** Second, the Act is closely drawn to address a sufficiently important interest in combatting "dependence corruption"—the improper dependence of public officials on deep-pocket interests that the Founders of our Republic viewed as anathema to our democracy. Founding-era history, the text of the Constitution, and tradition and precedent all demonstrate that Maine's interest in combatting dependence corruption is sufficiently important to justify upholding limitations on contributions to SuperPACs.

**III.** The Act's disclosure requirement also comports with the First Amendment. Disclosure requirements are subject to a "less intense standard of constitutional review" because they do not "prevent anyone from speaking" and "impose no ceiling on campaign-related activities." *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021) (quoting *Citizens United*, 558 U.S. at 366). The Act's disclosure requirement, which provides that a

18

SuperPAC must disclose its donors if it makes an expenditure of more than $250 for a particular candidate election, readily satisfies that lesser standard of review. The District Court itself recognized that the Act serves the State's interest in ensuring an informed electorate, an informational interest both this Court and the Supreme Court have found sufficient to support disclosure requirements.

The District Court invalidated the disclosure requirement only because it believed the requirement was too broad, given that a SuperPAC must disclose even low-value donors once it hits the $250 threshold for expenditures. But this Court has already rejected a *per se* rule that disclosure requirements must exempt small donors, explaining that knowing who is giving even $1 to a candidate can provide valuable information about the nature of the candidate's supporters, and therefore his ideology. *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 31-33 (1st Cir. 1993). And Maine had good reason to omit a small-donor exemption here given that, as Senator Bennett has explained, "[i]n our small state, it does not take much money to move the needle in an election." JA 45; *see Buckley*, 424 U.S. at 83 (stating that "the appropriate level at which to require . . . disclosure" "is necessarily a judgmental decision" and, therefore, "best left . . . to [legislative] discretion").

## STANDARD OF REVIEW

This Court reviews a "grant of permanent injunctive relief for abuse of discretion." *Asociación de Educación Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007). In that analysis, it reviews "findings of fact for clear error," while "[q]uestions of law are reviewed *de novo*." *Id.*

## ARGUMENT

The Maine Act's contribution limit and disclosure requirement comport with the First Amendment because they are common-sense regulations that prevent quid pro quo corruption and ensure that the electorate is informed about who is making the donations that shape Maine elections. The Act is also constitutional under basic principles of originalism. The District Court therefore erred in holding the Act unconstitutional, and this Court should reverse and lift the injunction that is preventing Maine from enforcing an Act that its citizens overwhelmingly support and that is vital to the integrity of the State's electoral process.

## I.    THE ACT'S CONTRIBUTION LIMIT COMPORTS WITH THE FIRST AMENDMENT.

Since *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Supreme Court has recognized that the First Amendment permits limits on campaign contributions that serve the government's important interest in preventing the occurrence and appearance of quid pro quo corruption. By contrast, the

Court has prohibited limits on political speech that cannot serve an interest in preventing the occurrence and appearance of quid pro quo corruption, such as independent expenditures that, by definition, cannot involve quid pro quo corruption. *Id. Citizens United* reaffirmed that basic framework. Under that framework, the Act's contribution limit readily passes constitutional muster.

**A.** ***Buckley* And *Citizens United* Establish A Clear Line Between Permissible Contribution Limits And Impermissible Limits On Independent Expenditures.**

**1.** In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Supreme Court first articulated the fundamental distinction between limits on campaign contributions (which may comport with the First Amendment) and limits on direct and independent expenditures (which do not). In that case, the Court considered a broad constitutional challenge to the Federal Election Campaign Act, which contained caps on campaign contributions to candidates and caps on expenditures. *Id.* at 7. The Court held that the former were constitutional, while the latter were not. *Id.* at 38, 58. In reaching that conclusion, the Court pointed to three salient differences between expenditures and contributions.

*First*, the Court found that limits on contributions place less of a burden on speech than limits on independent expenditures, justifying a

lower standard of constitutional scrutiny for contribution caps. *Id.* at 23. The Court explained that "[a] limitation on the amount of money a person may give . . . involves little direct restraint on his political communication" because "it permits the symbolic expression of support evidenced by a contribution" without "infring[ing] the contributor's freedom to discuss candidates and issues." *Id.* at 21. By contrast, limits on independent expenditures "represent substantial . . . restraints on the quantity and diversity of political speech" because—once an expenditure cap is reached—an entity is prohibited from funding any and all speech it desires to make on behalf of a candidate. *Id.* at 19. *Buckley* therefore held that, while limits on independent expenditures must withstand the highest level of constitutional scrutiny, *id.* at 44-45, limits on campaign contributions "may be sustained" so long as they are "closely drawn" to serve a "sufficiently important" state interest, *id.* at 25*; see McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (plurality opinion) (recognizing that *Buckley* applied strict scrutiny to independent expenditures and the "'closely drawn' test" to contribution limits).

*Second*, *Buckley* held that campaign contributions create a risk of quid pro quo corruption or the appearance of quid pro quo corruption, but independent expenditures do not "pose" "comparable" "dangers of real or apparent corruption." 424 U.S. at 46. The Court explained that the State's

interest in preventing politicians from trading political favors for "large contributions" is sufficiently important to justify contribution caps because that kind of "political quid pro quo" undermines "the integrity of our system of representative democracy." *Id.* at 26-27. And that was true even though bribery laws and disclosure requirements may reduce the occurrence of such quid pro quo arrangements. *Id.* at 27-28. Because the "appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" is enough to undermine the public's "confidence in the system of representative Government," *id.* at 27, the people, either directly or through their representatives, have an overriding interest in avoiding such quid pro quo corruption.

The Court found, however, that the same "opportunities for abuse" were not present with respect to independent expenditures because, by definition, independent expenditures do not involve any coordination between the candidate and the person or entity making the expenditure. *Id.*; *Citizens United v. FEC*, 558 U.S. 310, 360 (2010) ("[A]n independent expenditure is political speech . . . that is not coordinated with a candidate"). As *Buckley* explained, if the expenditures were "controlled by or coordinated with the candidate and his campaign," they would be "treated as

23

contributions rather than expenditures" and subject to significant limits. 424 U.S. at 46. It is "the absence of prearrangement and coordination . . . [that] alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." *Id.* at 47. If the candidate and the person or entity making the expenditure cannot communicate *at all* about the expenditure, they clearly cannot enter into an improper quid pro quo agreement about that expenditure. *See id.*

*Third*, *Buckley* observed that evidence of past corruption supported the constitutionality of contribution limits, but it did not find any similar evidentiary support for limiting independent expenditures. In considering the constitutional justification for contribution caps, the Court found that, "[a]lthough the scope of" quid pro quo corruption involving campaign contributions "can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one." *Id.* at 27. On the other hand, the Court did not cite any evidence of comparable corruption with respect to independent expenditures.

Summing up, *Buckley* concluded that the challenged contribution limits were constitutionally valid because they "serve[d] the basic governmental interest in safeguarding the integrity of the electoral process

without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion." *Id.* at 58. But limits on independent expenditures were unconstitutional because they lacked a similar quid pro quo justification and "place[d] substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression." *Id.* at 58-59.

**2.** *Citizens United* reinforced these basic distinctions between contribution limits and limits on independent expenditures. 558 U.S. 310. In striking down a law limiting the ability of corporations to make independent expenditures, the Court reiterated *Buckley*'s holding that the State's interest in preventing the occurrence or appearance of quid pro quo corruption is "sufficiently important" to allow contribution caps to withstand First Amendment scrutiny. *Id.* at 356 (citation omitted). But, as in *Buckley*, the Court found that the same interest cannot justify limits on independent campaign expenditures because of the "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent." *Id.* at 357 (citation omitted).

*Citizens United* recognized that a "single footnote" in its post-*Buckley* decision in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 788 n.26 (1978), "purported to leave open the possibility that corporate independent

expenditures could be shown to cause corruption," but *Citizens United* firmly shut that door. 558 U.S. at 357. It held that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Id.* That is because, "*[b]y definition*, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Id.* at 360 (emphasis added). Any doubt on this score was resolved by the absence of any evidence of quid pro quo corruption resulting from independent expenditures. *Id.* at 357-358. As the Court observed, the record in an analogous campaign-finance case "was 'over 100,000 pages' long," yet it did "not have any direct examples of votes being exchanged for . . . expenditures." *Id.* at 360 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 209, 560 (D.D.C. 2003)).

The Supreme Court returned to the point in a decision shortly after *Citizens United*, explaining that because independent expenditures are "not coordinated with a candidate," "[t]he candidate-funding circuit is broken." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 751 (2011) (quotation marks and citation omitted). "The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption" that makes contribution limits permissible. *Id.* Without coordination

between the candidates and the groups making the expenditures, there simply cannot be any quid pro quo agreements, or even the appearance of them. *See id.*

The logic of *Buckley* and *Citizens United* is thus clear: because there is no legally permissible coordination between those making an independent expenditure and a candidate or her campaign, there is no risk of quid pro quo corruption between those making the expenditure and the candidate or his campaign. The absence of coordination *means* the absence of any risk of a quid pro quo.

## B. Under This Framework, The Act's Contribution Limit Is Constitutional.

The reasoning of *Buckley* and *Citizens United* requires upholding Maine's Act. Because the Act limits *contributions* to entities that make independent expenditures (that is, SuperPACs), rather than limiting the independent *expenditures* themselves, the limits "may be sustained" because they are "closely drawn" to serve the State's substantial interest in preventing the occurrence and appearance of quid pro quo corruption. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam); *see Citizens United v. FEC*, 558 U.S. 310, 356 (2010); *Davis v. FEC*, 554 U.S. 724, 740 n.7 (2008) (quoting *McConnell v. FEC*, 540 U.S. 93, 136 (2003), *overruled in part on other grounds*, *Citizens United*, 558 U.S. 310). And unlike independent expenditures,

nothing about the nature of contributions to SuperPACs forecloses the possibility of quid pro quo corruption. To the contrary, Equal Citizens has presented ample evidence that unlimited contributions to SuperPACs have given rise to both the occurrence and appearance of quid pro quo corruption.

**1.** Start with the fundamental contrast between the opportunity for quid pro quo agreements with respect to contributions to SuperPACs and the lack of any such opportunity with respect to the independent expenditures those SuperPACs make.

In principle, as *Citizens United* explained—or as the Court put it, "[b]y definition"—an independent expenditure cannot involve coordination with a candidate. 558 U.S. at 360. "Independent" *means* without coordination, and therefore certainly, without any quid pro quo. Put differently, if there were a quid pro quo, the expenditure would not be "independent."

And in practice, a detailed web of state and federal regulations enforce independence between SuperPACs and a candidate or her campaign. Federal and state law prohibit SuperPACs from having any communication with the candidate or her campaign regarding its expenditures or considerations that might somehow inform the expenditures. *See generally, e.g.*, 52 U.S.C. §§ 30116, 30118 (establishing that independent expenditures by political action committees can become impermissible coordinated expenditures if

made "in cooperation, consultation, or concert with, or at the request or suggestion of" a candidate or a candidate's authorized committee); ME. STAT. tit. 21-A, § 1015(5) (same under Maine law); 11 C.F.R. § 109.21 (detailing what a "coordinated communication" is). *See also* 52 U.S.C. § 30109(d) (detailing potential fines and prison times); *id*. §§ 30116, 30118 (establishing that a SuperPAC making "coordinated" expenditures will lose its legal status and thereby be subject to the contribution limits of traditional PACs). If entities making independent expenditures violate these regulations by coordinating with a candidate or his campaign, they are liable to both civil and criminal penalties for any expenditures above the contribution limit. A $10 million independent expenditure by a PAC deemed to have been coordinated would be deemed a contribution, and would exceed contribution limits by $9,995,000. That would expose the committee to civil penalties; if intentional, it would expose principals to criminal prosecution. *See id*. § 30109(d); ME. STAT. tit. 21-A, § 1004.

Yet here is the fundamental point of this case: no comparable restrictions exist—or could exist effectively—for communications between candidates and SuperPAC *contributors*. Instead, federal law *authorizes* candidates to speak at fundraisers for SuperPACs at which unlimited funds are raised, and it even permits candidates to directly solicit contributions to

SuperPACs in amounts up to the federal limits for direct contributions. 52 U.S.C. § 30125(e); *see Fundraising for Super PACs by Federal Candidates*, Fed. Election Comm'n, https://www.fec.gov/help-candidates-and-committees/making-disbursements-pac/fundraising-super-pacs-federal-candidates-nonconnected-pac (last visited Oct. 22, 2025); *see also* ME. STAT. tit. 21-A, § 1015(4) (mandating that contribution limits apply to funds a candidate solicits for a single-candidate PAC).

Thus, while SuperPACs are banned from "coordinating" *expenditures* with a campaign, thereby blocking the opportunity for quid pro quo corruption, nothing blocks a contributor to a SuperPAC from coordinating with a candidate about the *contribution*, thereby creating an enormous opportunity for quid pro quo corruption.

Nor could the government plausibly or effectively ban such donor-candidate interactions or enforce a hypothetical "independent contributions" requirement that would track the "independent expenditures" requirement. It is easy for both a candidate and a SuperPAC to avoid communicating about how the SuperPAC should spend its money. It is therefore possible for a SuperPAC to ensure that its activities are actually independent of the candidate or her campaign. But SuperPACs would have no way to enforce an analogous limit on candidate-donor interactions

30

because they have way to know or control pre-contribution communications between a prospective donor and a candidate. And plainly, there could be no constitutional or effective way for a SuperPAC to be obligated to police the interactions between its donors and a candidate or his committee. *See McConnell*, 540 U.S. at 183 (affirming the constitutionality of solicitation limits in part because they "accommodat[ed] the individual speech and associational rights of federal candidates" in a way an "outright ban on solicitations" would not).

Accordingly, the "separation between candidates and independent expenditure groups" that "negates the possibility that independent expenditures will result in . . . *quid pro quo* corruption" simply does not exist when it comes to the relationship between candidates and contributors to independent-expenditure groups. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 751 (2011). The conclusion that "*[b]y definition*," *Citizens United*, 558 U.S. at 360 (emphasis added), independent expenditures could involve no quid pro quo corruption, *by definition* flatly does not hold for contributions to independent-expenditure committees.

**2.** The possibility of quid pro quo corruption with respect to contributions to SuperPACs is not merely theoretical. Unlike in the independent-expenditure context, where the Supreme Court found no

31

evidence of quid pro quo corruption, *see id.*, ample evidence documents the occurrence and appearance of quid pro quo corruption with respect to contributions to SuperPACs.

For example, former Senator Robert Menendez was infamously indicted in 2015 for soliciting "approximately $300,000 for" a SuperPAC in return for "advocacy at the highest levels of [the Department of Health and Human Services]." *United States v. Menendez*, 132 F. Supp. 3d 635, 640 (D.N.J. 2015) (citation omitted). Senator Menendez tried to dismiss the indictment on the very ground Plaintiffs urged here—that such contributions could not be corrupting under *Citizens United*, citing the D.C. Circuit's decision in *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc). The district court in Menendez's case rejected the argument, explaining that regardless of the "real value of independent expenditures," Menendez could subjectively value SuperPAC donations "earmarked" for expenditures related to his campaign. *Menendez*, 132 F. Supp. 3d at 640. The contributions also "unquestionably had value" to the SuperPAC itself. *Id.* Hence the quid pro quo: an elected official corruptly seeking a donation "for [a SuperPAC], in return for being influenced in the performance of an official act." *Id.*; *see also id.* at 643 (stating that the indictment "clearly allege[d] an explicit *quid pro quo*").

While Senator Menendez was ultimately acquitted by a jury, his case shows the very real possibility of quid pro quos involving contributions to SuperPACs. And his case is not alone. *See, e.g.*, *United States v. Lindberg*, No. 19-CR-22, 2020 WL 520948, at *2 (W.D.N.C. Jan. 31, 2020) (declining to dismiss an indictment of individuals who, among other things, offered to "put $1.5 million" into an "independent expenditure committee" in exchange for action by a state insurance commissioner); Opinion & Order, Dkt. No. 498, *United States v. Vázquez-Garced*, No. 3:22-CR-342, at 12-23 (D.P.R. Mar. 7, 2024) (declining to dismiss the indictment of a former governor of Puerto Rico for appointing an individual as a banking regulator in exchange for a commitment to "fund [a] SuperPAC," and finding that this could constitute "a quid pro quo"); *United States v. Householder*, No. 1:20-CR-77, 2023 WL 24090, at *5 (S.D. Ohio Jan. 3, 2023) (declining to dismiss the RICO indictment of a former Ohio house speaker for "agree[ing] to receive and accept millions of dollars in bribe payments . . . including bribe payments paid through GENERATION NOW[, a SuperPAC], in return for . . . taking specific official action" (citation omitted)); Judgment, Dkt. No. 288, *Householder*, No. 1:20-cr-77 (July 6, 2023).

The District Court also had before it hard evidence that contributions to SuperPACs give rise to the appearance of quid pro quo corruption. Equal

Citizens's expert conducted two robust research surveys of the American public in general and Maine citizens in particular to determine the perceived likelihood of an elected official selling a policy outcome in exchange for SuperPAC contributions. JA 200-215. That analysis revealed that below $5,000, a majority of individuals believe that quid pro quo corruption is relatively unlikely. But that result flips dramatically "at or above" $5,000, where a clear majority believe quid pro quo corruption is likely to occur. JA 206. As Equal Citizens's expert detailed, imposing a $5,000 contribution limit has a clear salutary effect by causing a 10%-plus swing in the percentage of individuals who believe various quid pro quo corruption scenarios are likely to occur. JA 209-210.

**3.** Finally, the Act readily satisfies the level of constitutional scrutiny that applies to contribution limits because it is "closely drawn" to serve the State's interest in combatting such actual and apparent quid pro quo corruption. *Buckley*, 424 U.S. at 25. The Act establishes a cap of $5,000 on contributions to SuperPACs, which falls well within the range of similar contribution limits the Supreme Court has upheld, while still allowing SuperPACs to aggregate and spend significant sums. *See, e.g.*, *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 201 (1981) (upholding a $5,000 limit on contributions to multicandidate political committees); *Nixon v. Shrink Mo.*

*Gov't PAC*, 528 U.S. 377, 384-385 (2000) (upholding a $1,075 contribution limit); *Buckley*, 424 U.S. at 13, 38 (upholding a $1,000 contribution limit). The Court has held, moreover, that contribution limits need not be "fine tun[ed]" and that "distinctions in degree" will "not invalidate the legislation." *Buckley*, 424 U.S. at 30.

Nor is there another ready alternative to contribution limits that Maine failed to consider. As noted, the State could not plausibly impose the sort of restrictions on coordination between candidates and contributors that make independent expenditures independent, *see supra* pp. 30-31; indeed, no government has even tried. And while bribery laws and disclosure requirements also seek to preclude quid pro quo corruption, *Buckley* long ago expressly held that "Congress was surely entitled to conclude that . . . contribution ceilings [a]re a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions." *Id.* at 28. Likewise, the overwhelming majority of Maine's voters was "surely entitled" to make the same determination in adopting the contribution limit at stake here. *Id.*

## C.    The Arguments To The Contrary Lack Merit.

**1.** The District Court erroneously concluded that *Citizens United* required striking down the Maine Act's contribution limit. The Court did not

dispute Equal Citizens's ample evidence that unlimited contributions to SuperPACs have given and may give rise to quid pro quo corruption. But it became the first court since *Buckley* to hold that "[e]ven accepting that" contributions "*can* serve as the quid in a quid pro quo arrangement," the Act's limits are nonetheless unconstitutional. JA 352 (emphasis added).

To reach this conclusion, the court crafted out of whole cloth a wholly new justification for blocking the regulation of contributions to independent political action committees under *Citizens United*. As the District Court reasoned,

> I do not read the Supreme Court [in *Citizens United*] as suggesting that independent expenditures are wholly incorruptible, but rather that they are sufficiently removed from the candidate so that the danger of such corruption is "substantially diminished" to the point that the government's "anticorruption interest is not sufficient to displace" First Amendment protections. . . . Given that contributions to independent expenditures are one step further removed from the candidate, the logic of *Citizens United* dictates that the danger of corruption is smaller still.

JA 352-353.

This reasoning is doubly wrong.

*First*, it misunderstands *Citizens United*. In that case, the Court did not hold that the quid pro quo corruption associated with independent expenditures was not sufficient to justify caps; it flatly held that—"[b]y definition"—there is *no* quid pro quo corruption associated with independent

expenditures because they do not involve coordination between a candidate and the independent-expenditure group. *Citizens United v. FEC*, 558 U.S. 310, 360 (2010). That reasoning simply does not transfer to contributions to SuperPACs, where coordination is not — and *could not be* — barred, and quid pro quo corruption is therefore possible. The Supreme Court was plainly not crafting a continuum, along which direct campaign contributions are very corrupt, while independent expenditures are only slightly so (and hence, since one step removed, contributions to SuperPACs are even less corrupt); it was defining ("[b]y definition") independent expenditures as not corrupt. *Id.*

*Second*, the District Court's suggestion that, even if there is an anti-corruption interest, it is not sufficient to justify contribution limits, beggars belief. Under the rule the District Court established, contributors are now free to give $10 million to a SuperPAC whereas a contributor to a campaign can be blocked from giving $10,000. No one could believe the risk of quid pro quo corruption from the $10 million contribution is less than the risk from a $10,000 contribution to a campaign. Certainly, the Supreme Court has never suggested as much.

**2.** The courts of appeals to address the issue have also erroneously concluded that *Citizens United* requires striking down limits on

contributions to SuperPACs, but their error is even more fundamental. Beginning with the D.C. Circuit's en banc decision in *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc), the courts of appeals have held that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations." They reason that, in finding that independent expenditures cannot give rise to quid pro quo corruption, *Citizens United* relied on the separation between candidates and the entities that make independent expenditures, and contributions to those entities are "one step removed." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013); *see also, e.g.*, *Long Beach Area Chamber of Com. v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010) ("[T]he need for contribution limitations to combat corruption or the appearance thereof tends to decrease as the link between the candidate and the regulated entity becomes more attenuated."). That "one step removed," these courts conclude, means that there is no risk of quid pro quo corruption. Again, and importantly—because it demonstrates again how extreme the District Court's opinion in this case is—these courts did not conclude that SuperPACs are protected *despite* the risk of quid pro quo corruption. They held instead

38

that there simply *was no risk* of quid pro quo corruption in contributions to SuperPACs.

That reasoning, however, ignores that contributors are *not* structurally separated from candidates—nor regulated to remain so—unlike the entities that make independent expenditures. Indeed, donors are not separated at all from candidates because they may interact with candidates and coordinate their contributions with candidates, and thus those interactions can give rise to the occurrence and appearance of quid pro quo corruption that contribution limits have long sought to prevent. In none of these courts-of-appeals cases did the courts recognize this fundamental difference between an independent expenditure and a contribution to an independent-expenditure committee. Every one of these courts assumed there was no corruption risk, even though—as the evidence shows—there plainly is.

## II. THE ORIGINAL MEANING OF THE FIRST AMENDMENT CONFIRMS THE CONSTITUTIONALITY OF THE CONTRIBUTION LIMIT.

Equal Citizens submits that basic principles of originalism confirm that the contribution limit at issue here is constitutional. We concede, of course, that the Supreme Court has not yet considered how originalism interacts with the First Amendment in the context of campaign-finance legislation. Yet we submit that, as the Court has increasingly emphasized that constitutional texts must be interpreted "with the scope they were understood to have when

39

the people adopted them, whether or not . . . future judges think that scope too broad," *District of Columbia v. Heller*, 554 U.S. 570, 634-635 (2008); *see also, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (turning to the "historical background of the" Confrontation Clause "to understand its meaning"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022) ("Examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification [is] a critical tool of constitutional interpretation." (cleaned up)); *United States v. Rahimi*, 602 U.S. 680 (2024) (five opinions emphasizing that constitutional text must be interpreted according to originalist principles), originalism must be considered in this case too.

The case that became *Heller* supports the argument that this Court should consider originalism. In that case, the D.C. Circuit not only considered the gun regulation at issue under the existing Second Amendment precedent but also reexamined that precedent to determine whether it was consistent with the original meaning of the Second Amendment. *See Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) (Silberman, J.), *aff'd sub nom.*, *Heller*, 554 U.S. 570.

Applying the same approach here confirms that the Act's contribution limit is constitutional. That is true for two reasons. *First*, Justice Thomas has

explained that restrictions on speech are necessarily constitutional "if they would have been permissible at the time of the founding." *Biden v. Knight First Amend. Inst. at Colum. Univ*, 141 S. Ct. 1220, 1223-24 (2021) (Thomas, J., concurring). Equal Citizens's historical expert has established that, at the time of the Framing, a law could not be found to violate the First Amendment if it was adopted by the people to serve the public good—as happened here when Maine citizens overwhelmingly voted to enact the Act in this case. *Second*, and independently, the Framers would have found the Act compatible with the First Amendment because it advances the State's compelling interest in fighting "dependence corruption," JA 355, which occurs when elected officials become dependent on individuals other than "the people alone," as James Madison put it in THE FEDERALIST NO. 52, at 326 (James Madison) (Clinton Rossiter ed., 1961)—adding that by "the people," he meant "[n]ot the rich, more than the poor," *id.* NO. 57, at 351 (James Madison).

Again, we concede that the Supreme Court has neither considered nor embraced either of these originalist rationales for upholding contribution limits, and *Buckley*'s framework for analyzing the constitutionality of contribution limits prevents the Court from upholding the Act based purely on the fact that it was enacted by the people to serve the public good. *Buckley*

*v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam) (instructing courts to assess whether there is a sufficiently important interest to justify a campaign-contribution limit); *see also FEC v. Cruz*, 596 U.S. 289, 305 (2022) (stating that, to date, the Supreme Court "has [so far] recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance" (citation omitted)).

But *Buckley* never addressed the original meaning of the First Amendment, and the Supreme Court has never had occasion to consider whether evidence from the Framing supports complementing its focus on quid pro quo corruption with a second kind of corruption—dependence corruption—which, as Equal Citizens submits, was even more salient and important to the Framers. JA 169-196.

The Court is not obliged to reach this question, of course, since the distinction between contributions limits and independent-expenditure restrictions is fully sufficient to uphold the Maine Act. But the originalist evidence, at the very least, may be helpful to subsequent courts as they evaluate the First Amendment questions surrounding campaign-finance regulation, especially over SuperPACs.

42

**A.    The Original Meaning Of The First Amendment Would Not Restrict The Legislature Or The People From Policing Contributions To Political Action Committees.**

Following the method that Justice Thomas has described for determining the limits of the First Amendment, Maine's law is plainly constitutional. Justice Thomas has stated that "regulations that might affect speech are valid if they would have been permissible at the time of the founding." *Biden v. Knight First Amend. Inst. at Colum. Univ*, 141 S. Ct. 1220, 1223-24 (2021) (Thomas, J., concurring); *see McKee v. Cosby*, 586 U.S. 1172, 1173 (2019) (Thomas, J., concurring in the denial of certiorari) (stating that courts "should carefully examine the original meaning of the First" Amendment by applying it "as it was understood by the people who ratified it").

In this case, Equal Citizens presented the expert report of Stanford Professor Jonathan Gienapp to show that—at the time of the Founding—restrictions on speech were permitted so long as they were enacted through a process "representative of the people" and serving "the interest of the public good." JA 167. To elaborate, "[i]t was widely assumed at the Founding and for decades to follow that the people would themselves safeguard their own liberties through their representative institutions." JA 167. "If the government legitimately represented the people, then their liberty was

preserved, because [any regulations the people passed through representative institutions meant that] *they* would be coercing *themselves*." JA 166. It would only be if those representative institutions did not regulate "liberty in the interest of the public good" that judges would have to step in "to protect individuals from political majorities"; otherwise, there would be no cause "to question the legitimacy of how [politically accountable legislatures] had struck the balance between the good of the whole and the rights of the few." JA 167.

In other words, so long as a law regulating speech is enacted through a process "representative of the people" and serving "the interest of the public good," JA 167, it "would have been permissible at the time of the founding." *Biden*, 141 S. Ct. at 1223-24 (Thomas, J., concurring). Such is true here, as the Act was approved by an overwhelming majority of Maine voters, and the contribution limit serves the interest of the public good by helping to ensure elected officials attend to the public-policy issues ordinary Mainers care about rather than "choos[ing] to curry favor with anonymous megadonors to access their deep coffers." JA 51. At least where, as here, a regulation is not viewpoint-based, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 384-385 (1992), the Maine law should be upheld under the original meaning of the First Amendment.

**B.    The    Regulation    Of    Dependence    Corruption    Is    A "Sufficiently Important Interest" To Sustain Maine's Law.**

The Framers would also have found the law constitutional for a separate, independent reason: it serves the State's compelling interest in combatting "dependence corruption." JA 355. That form of corruption occurs when political officials become improperly dependent on powerful entities rather than the constituents who elected them. The Framers established a Republic with a representative government that was to be "dependent on the people alone," THE FEDERALIST NO. 52, at 326 (James Madison) (Clinton Rossiter ed., 1961)—where "the people" meant "[n]ot the rich, more than the poor," *id.* NO. 57, at 351 (James Madison). Any practice that creates a conflicting dependence on the tiny few who contribute to SuperPACs rather than the electorate as a whole is plainly a corruption of that ideal.

Founding-era history, the text of the Constitution, post-enactment history, tradition, and precedent all demonstrate that the Framers were as concerned about dependence corruption as they were about the quid pro quo corruption on which the Supreme Court has so far been focused in its campaign-finance cases. This Court should therefore recognize that—like the State's interest in combatting quid pro quo corruption—its interest in combatting dependence corruption is sufficiently important to justify the

Act's contribution limits. *Cf. Michael H. v. Gerald D.*, 491 U.S. 110, 122-123 (1989) (stating that the Supreme Court has "insisted" that an "asserted liberty interest be rooted in history and tradition" and "be an interest traditionally protected by our society"; likewise, should the state's regulatory interest be "rooted in history and tradition" and "traditionally protected by our society").

**1. Founding-Era History.** During the Republic's early years, candidates did not campaign for office. There are therefore no Founding-era examples of laws regulating campaign contributions. *See* Zephyr Teachout, *Corruption in America: From Benjamin Franklin's Snuff Box to* Citizens United 175 (2014) (explaining that Andrew Jackson's 1828 presidential campaign was the first to actively engage potential voters); Lawrence Lessig, *What an Originalist Would Understand "Corruption" to Mean*, 102 CALIF. L. REV. 1, 20 (2014); JA 195-196.

Nonetheless, the historical record shows that the Framers were acutely focused on the sort of dependence corruption that contribution limits now address. Their concern was that representatives would be improperly dependent. That improper dependence was manifest in England, for example, with the "problem of placemen" that plagued England and the

46

Colonies before the American Revolution. Teachout, *supra*, at 59-67; *see also* JA 180.

At that time, the King of England dispensed honors, offices, and privileges to build an elaborate network of contacts throughout his kingdom. Gordon S. Wood, *The Creation of the American Republic 1776-1787*, at 146 (1998). "Placemen" were parliamentarians who became "enthralled" by the promise of such patronage appointments and "lost their concern for their country." *Id.* at 146, 212. Historical evidence suggests that the question of how to prevent "placemen"—that is, "people going into office not to represent the public but in order to get a well-paid job"—was the subject of extensive debate at the Constitutional Convention. Teachout, *supra*, at 59-67; *see also* JA 181.

The Framers were likewise troubled by "rotten boroughs," electoral districts in England with populations disproportionate to their representation. Teachout, *supra*, at 72-74; *see also* JA 184-185. A member of the aristocratic elite could buy off the small number of voters in a rotten borough and thereby control outsized political power. Convention delegates referred to rotten boroughs as the "kind of objectionable governmental action that the Constitution should not tolerate." *Wesberry v. Sanders*, 376 U.S. 1, 15 (1964).

Of equal concern were the ambitions of private stakeholders. One of the charges leveled against the House of Representatives in the ratification debates was that it would lack "sympathy with the mass of the people" and lose "a proper responsibility" to the electorate in favor of a small but powerful constituency. THE FEDERALIST NO. 57, *supra*, at 350-351 (James Madison). Federalists and Anti-Federalists alike considered it "*essential*" to the republican form of government "that it be derived from the great body of the society, not from an inconsiderable proportion or a favored class of it." *Id.* NO. 39, at 241 (James Madison). Proponents of the Constitution were thus pressed to demonstrate to their fellow colonists that the House had been "so constituted as to support in the members an habitual recollection of their dependence" on "the great body of the people of the United States": "Not the rich, more than the poor; not the learned, more than the ignorant; not the haughty heirs of distinguished names, more than the humble sons of obscure and unpropitious fortune." *Id.* NO. 57, at 351-352 (James Madison).

The Framers were also concerned about public officials becoming dependent on constituencies with no connection to the electorate. George Mason fretted that out-of-state residents would seek to "purchase an Election" in a sister state. Teachout, *supra*, at 75 (citation omitted). Edmond Randolph expressed similar concerns, explaining that "[i]t was thought

proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states." David Robertson, *Debates and Other Proceedings of the Convention of Virginia* 330 (2d ed. 1805). The Framers wished to avoid becoming dependent on a foreign crown in the same way the British government had become dependent to the Bourbons, "even if there was no clear quid pro quo tied to the gifts." Lawrence Lessig, *Republic, Lost: How Money Corrupts Congress—and a Plan to Stop It* 19 (2011).

In short, "the big fear underlying all the small fears" of the delegates to the Constitutional Convention was whether the new nation could "control corruption as England and France had not." Teachout, *supra*, at 57. That corruption was not quid pro quo corruption; it was the corruption effected through an improper dependence. Nothing was more desired than elected representatives "dependent on the people alone," THE FEDERALIST NO. 52, *supra*, at 326 (James Madison), for such was "*essential* to [republican] government," *id*. NO. 39, at 241 (James Madison); *see* JA 185.

When interpreting the First Amendment, this Court should accordingly account for the Founders' serious concern with dependence corruption—and interpret the First Amendment to permit regulations that squarely address such corruption. *Cf. United States v. Rahimi*, 602 U.S. 680,

49

691-692 (2024) (explaining that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791"); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional.").

**2. Text.** The Founders' concern with dependence corruption is also reflected in the text of the Constitution itself, demonstrating that Maine's law regulating SuperPAC contributions "fits within the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 682. Multiple constitutional provisions were intended to ensure "dependen[ce] on the people alone." THE FEDERALIST NO. 52, *supra*, at 326 (James Madison).

*The Ineligibility and Emoluments Clause.* The Constitution provides that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time." U.S. CONST. art. I, § 6, cl. 2. Convention delegates saw this measure as a precaution against the problem of placemen, explaining that the provision would "preserv[e] the Legislature as pure as possible, by shutting the door against appointments of its own members to

offices." 1 *Records of the Federal Convention of 1787*, at 386 (Max Farrand ed., 1911) (Rutlidge).

*Frequent Elections*. Frequent elections were deemed "the only policy by which" a proper "dependence and sympathy" with the people could be "effectually secured." THE FEDERALIST NO. 52, *supra*, at 327 (James Madison). The Framers thus provided for House elections "FREELY by the WHOLE BODY of the people every SECOND YEAR." *Id.* NO. 41, at 260 (James Madison). This was a marked departure from the seven-year terms of members of the House of Commons, which, James Madison theorized, gave the executive too much time to weaken representatives' sense of obligation to the people who voted them into office. Teachout, *supra*, at 71; JA 185; *cf.* JA 190 (explaining that "commitment to annual elections was arguably the single most important anti-corruption provision of the first state constitutions").

*Electoral College*. The Framers' decision to select the President through the Electoral College was likewise intended to limit "the danger of cabal and corruption." 2 *Records of the Federal Convention of 1787*, at 500 (Max Farrand ed., 1911) (Mason). Alexander Hamilton explained that if the President were "appointed by the Legislature," he "would be tempted to make use of corrupt influence to be continued in office." *Id.* at 524

(Hamilton); *see id.* at 31, 404 (Morris). The delegates' solution was to select the President through the Electoral College, which, James Wilson explained, was "as nearly home to the people as is practicable." 2 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 512 (Jonathan Elliot ed., 1836).

*The Census.* The decennial census was the Framers' answer to rotten boroughs. Teachout, *supra*, at 74. The Census Clause requires that the number of legislators be tied to the number of people in each state, rather than allowing a small number of people to have an outsized influence over U.S. politics. U.S. CONST. art. I, § 2, cl. 3.

*Eligibility Requirements.* The Constitution's birthplace and residency restrictions were also devised to ensure the government's dependence on the intended constituents. *See id.* art. I, § 2, cl. 2 (Representatives); *id.* § 3, cl. 3 (Senators); *id.* art. II, § 1, cl. 5 (President). Mason explained that without the residency requirement, "[r]ich men of neighbouring States" may "employ with success the means of corruption in some particular district and thereby get into the public Councils after having failed in their own State." 2 *Records of the Federal Convention of 1787*, *supra*, at 218.

As these provisions show, the Constitution's text reflects the Framers' deep concern with dependence corruption, providing strong support for

Maine's interest in addressing this form of corruption in the Act—and for this Court to at least essay to show how the original meaning of the First Amendment would permit regulations that address such corruption. *See N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 64 (1982) (plurality opinion) (explaining that constitutional text "must be interpreted in light of the historical context in which the Constitution was written, and of the structural imperatives of the Constitution as a whole"); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (explaining that the Necessary and Proper Clause cannot be read to "undermine the structure of government established by the Constitution"); JA 189-190 (noting that dependence-corruption concerns were also reflected in early state constitutions).

**3. Tradition and Precedent.** While the most relevant history comes from the Framing, where—as here—a practice did not arise until well after the Framing, more recent tradition and precedent may also be relevant. *Cf. Rahimi*, 602 U.S. at 682 (consulting the "Nation's regulatory tradition" to determine the Second Amendment's application to changing technology); *McIntyre*, 514 U.S. at 378 (Scalia, J., dissenting) ("Where the meaning of a constitutional text (such as 'the freedom of speech') is unclear, the widespread and long-accepted practices of the American people are the best

indication of what fundamental beliefs it was intended to enshrine."). As noted, early Presidents did not campaign, and so the problem of campaign finance did not come to Congress's attention until the turn of the century when President Teddy Roosevelt introduced the first campaign-finance legislation, the Tillman Act. Teachout, *supra*, at 188. The Federal Corrupt Practices Act and its amendments followed, limiting party and candidate spending in U.S. Senate races and primaries. *Id.* And in 1913, the Seventeenth Amendment was ratified to reign in corruption by corporate interests. *Id.* at 189.

"For nearly seventy years after Roosevelt left office, courts upheld . . . campaign finance rules against an array of constitutional challenges." *Id.* And during this time, the Supreme Court recognized that campaign-finance laws were a legitimate exercise of Congress's authority "to prevent the subversion of the integrity of the electoral process," notwithstanding countervailing First Amendment concerns. *United States v. UAW-CIO*, 352 U.S. 567, 575 (1957); *see supra* pp. 20, 34-35.

This early response to the first campaign-finance laws further confirms the constitutionality of laws like Maine's, which address not only quid pro quo corruption but also the broader form of dependence corruption that

troubled the Framers and that the first campaign-finance laws sought to address.

## III. THE ACT'S DISCLOSURE REQUIREMENT IS INDEPENDENTLY PERMISSIBLE.

This Court should also reverse the District Court's holding that the Act's disclosure requirement violates the First Amendment. For nearly fifty years, the Supreme Court has consistently upheld election-related disclosure requirements. *See Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (per curiam) (upholding disclosures for contributions to political campaigns); *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 202-203 (1999) (upholding the disclosure of initiative sponsors and amounts spent gathering support for initiatives); *Doe v. Reed*, 561 U.S. 186, 191 (2010) (holding that the disclosure of referendum signatories "does not as a general matter violate the First Amendment").

This Court, too, has repeatedly upheld campaign-financing disclosure requirements against constitutional challenges. *See, e.g.*, *Gaspee Project v. Mederos*, 13 F.4th 79, 95-96 (1st Cir. 2021) (upholding disclosure laws related to independent expenditures and electioneering communications); *Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 40-41 (1st Cir. 2012) (upholding disclosures for ballot-question committees); *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 118-120 (1st Cir. 2011) (upholding

disclosure laws related to independent expenditures); *Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 205 F.3d 445, 465-466 (1st Cir. 2000) (upholding disclosure laws related to independent expenditures).

It should do the same here. The Act's requirement that a SuperPAC must disclose the names of its contributors when it makes an independent expenditure of more than $250 readily satisfies the applicable constitutional standard, and the District Court's decision to the contrary conflicts with this Court's precedent.

**1.** Disclosure requirements are subject "to a less intense standard of constitutional review" because, unlike limits on election-related spending, "election-related disclosure and disclaimer requirements 'impose no ceiling on campaign-related activities.'" *Gaspee Project*, 13 F.4th at 85 (quoting *Citizens United v. FEC*, 558 U.S. 310, 366 (2010)). "Nor do they 'prevent anyone from speaking.'" *Id.* (quoting *Citizens United*, 558 U.S. at 366).

Accordingly, disclosure requirements are subject to "exacting," rather than strict, scrutiny. *Id.* In its recent decision in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 607 (2021), the Supreme Court clarified that this standard requires a disclosure requirement to be narrowly tailored to a sufficiently important government interest. As this Court explained in *Gaspee Project*, under *Americans for Prosperity*, the disclosure requirement

"need not reflect the least restrictive means available to achieve" that interest, but it must "achieve a reasonable fit." 13 F.4th at 88; *see id.* at 85 ("[E]xacting scrutiny 'require[s] a fit that is not necessarily perfect, but reasonable.'" (quoting 594 U.S. at 609)).

**2.** Here, Defendants set forth three independent governmental interests that justify the Act's requirement that a SuperPAC disclose the names of its donors when it makes an expenditure over $250 for a single candidate's election. *First*, the State has an informational interest in disclosing who funds independent expenditures in local elections so that Maine voters "may consider . . . the source and credibility" of those funds, *First Nat'l Bank of Bos. v. Belotti*, 435 U.S. 765, 791-792 (1978), and "give proper weight to different speakers and messages," *Citizens United*, 558 U.S. at 371; *see also Daggett*, 205 F.3d at 465-466 (1st Cir. 2000). *Second*, Maine has a "particularly strong" interest with "respect to efforts to root out fraud." *Reed*, 561 U.S. at 197. Lack of disclosure begets fraud and stymies Maine's efforts to tame it, which "drives honest citizens out of the democratic process and breeds distrust of our government." *Id.* (citation omitted). *Third*, Maine's disclosure requirement "deter[s] actual corruption and avoid[s] the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley*, 424 U.S. at 67.

The Supreme Court has held that each of these interests are "sufficient in general to justify requiring disclosure of information concerning campaign contributions and expenditures." *Brown v. Socialist Workers '74 Campaign Comm'n (Ohio)*, 459 U.S. 87, 92 (1982). And *Citizens United* itself recognized that an "informational interest alone is sufficient to justify" disclosure requirements. 558 U.S. at 369.

**3.** The District Court agreed that Maine's "interest in an informed electorate is sufficiently important to" justify its disclosure requirement. JA 358 (quoting *Gaspee Project*, 13 F.4th at 88). The court found, however, that the Act is not "narrowly tailored to that interest," JA 358, because it requires a SuperPAC to disclose the names of all the contributors when it makes an expenditure of more than $250, without allowing donors to opt out of contributing to independent expenditures and, "most importantly," without exempting "contributors who give even very small amounts of money," JA 359. The court believed that the Act was required to have an opt-out provision and an exemption for small donors because, in *Gaspee Project*, this Court upheld the constitutionality of a Rhode Island disclosure requirement that had those features. JA 358-359. But *Gaspee Project* did not hold that those features were *necessary* to render that Rhode Island law constitutional. And this Court has previously held that a disclosure

requirement may not be deemed *per se* unconstitutional merely because it is triggered by contributions of any size. *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993).

In *Vote Choice*, this Court explained that "signals are transmitted about a candidate's positions and concerns not only by a contribution's size but also by the contributor's identity." *Id.* at 32. This Court further explained that the "ideological interests" of a candidate "may often be discerned as clearly" from the identity of the individuals making $1 contributions to support him "as from a $100 contribution." *Id.* This Court therefore rejected the contention that there is a *per se* bar on "first dollar disclosure" requirements like Maine's, *id.*, holding instead that a more nuanced, "contextual" analysis is required to determine whether such a law is constitutional, *id.* at 33.

Moreover, while *Vote Choice* ultimately found that a "contextual" examination of the Rhode Island law at stake in that case demonstrated that its "first dollar disclosure" requirement was unconstitutional, Maine's Act does not suffer from the flaws the Court pointed to there. *Id.* at 33-36. The Rhode Island law required disclosure of *all* contributions to PACs, creating a grave disparity with individual contributions to candidates, which did not have to be disclosed unless they were above a $100 threshold. *Id.* at 35. By

contrast, Maine's disclosure requirement does not apply unless an entity makes an independent expenditure of more than $250 dollars, and that requirement is well in line with Maine's $50 threshold for disclosing individual donations. *See* ME. STAT. tit. 21-A, § 1017(5). That is the opposite of Rhode Island's scheme in *Vote Choice*.

Nor did the District Court point to any other relevant context to support its determination that Maine's disclosure requirement is unconstitutional. Indeed, the only other thing the District Court pointed to was the absence of a provision in the Act permitting donors to opt out of contributing to independent expenditures over $250. JA 359. But it is unclear what difference such a provision could make because—statute or no—a contributor could always condition his donation to a SuperPAC on a promise that the money will not be used for independent expenditures above $250. And the District Court disregarded the far more relevant context provided by State Senator Richard A. Bennett, who explained that the first-dollar disclosure requirement reflects the nature of Maine politics: "In our small state, it does not take much money to move the needle in an election." JA 45.

**4.** The District Court's holding was also out of step with Supreme Court precedents. In *Buckley*, the Court rejected the assertion that the legislature

must choose "the highest reasonable threshold" for disclosures and affirmed the $10 disclosure threshold at stake in that case. 424 U.S. at 83-85.

*Buckley* also explained that decisions about where to put the threshold are best left to the politically accountable legislature, rather than the courts. *Id.*; *see also, e.g.*, *Brown*, 459 U.S. at 89 & n.2 (specifically noting that a statute mandated first-dollar disclosure, yet failing to identify any potential constitutional infirmity); *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 300 (1981) (stating that "if it is thought wise, legislation can outlaw anonymous contributions"); *cf. Cal. Bankers Ass'n v. Schultz*, 416 U.S. 21, 55-56 (1974) (holding that the First Amendment does not create a *per se* rule forbidding the disclosure of contributor names in all situations); *Or. Socialist Workers 1974 Campaign Comm'n v. Paulus*, 432 F. Supp. 1255, 1260 (D. Or. 1977) (upholding a first-dollar recordkeeping and partial public-disclosure threshold).

**5.** Finally, it bears emphasizing that the disclosure requirement does not rise or fall with the constitutionality of the Act's contribution limit. As *Buckley* explained, contribution limits and disclosure requirements work hand-in-hand, so Maine was well within its power to impose both a disclosure requirement and a "concomitant" "contribution ceiling[ ]." 424 U.S. at 28. And while the limit and the disclosure requirement both serve the

State's interest in combatting quid pro quo corruption, the disclosure requirement is independently justified by the State's informational and enforcement interests. Thus, even if the Court finds that the contribution limit is somehow unconstitutional, that does not mean the disclosure requirement is too. In fact, *Citizens United* upheld disclosure requirements even as it prohibited independent-expenditure limits that did not address corruption. 558 U.S. at 361, 368.

## CONCLUSION

For the foregoing reasons, the District Court's decision granting a permanent injunction should be reversed.

Dated: October 22, 2025

By: */s/ Neal Kumar Katyal*

NEAL KUMAR KATYAL
COLLEEN E. ROH SINZDAK
JESSICA C. HUANG
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave, NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure ("FRAP") 32(a)(7)(B) because it contains 12,994 words, excluding the parts of the brief exempted by FRAP 32(f).

2. This brief also complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Georgia) using Microsoft Word, the same program used to calculate the word count.

Dated: October 22, 2025

By: */s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on October 22, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Dated: October 22, 2025

By: */s/ Neal Kumar Katyal*
Neal Kumar Katyal

**ADDENDUM**

## TABLE OF CONTENTS

Page

Order Granting Plaintiffs' Motion for Permanent Injunction
(ECF No. 74)...................................................................... Add. 1

Judgment (ECF No. 75)......................................................... Add. 16

i

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| DINNER TABLE ACTION et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00430-KFW |
| | ) | |
| WILLIAM J. SCHNEIDER, | ) | |
| in his official capacity as Chairman | ) | |
| of the Maine Commission on | ) | |
| Governmental Ethics and Election | ) | |
| Practices, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER[1]

The Supreme Court has recognized only one constitutional basis for restricting political speech: preventing quid pro quo corruption or its appearance. *See FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022). Along those lines, the Court has struck down restrictions on independent political expenditures made without any candidate coordination after concluding that such expenditures—unlike direct campaign contributions—"do not give rise to corruption or the appearance of corruption." *Citizens United v. FEC*, 558 U.S. 310, 357 (2010). The primary question in this case is whether Maine's recently enacted law limiting contributions to political action committees (PACs) that make independent expenditures (often referred to as super PACs) is a constitutional means of preventing quid pro quo corruption or whether it runs afoul of the Court's First Amendment jurisprudence.

---

[1] The parties have consented to me presiding over this case. *See* ECF Nos. 11, 44.

## I.  Background

In November 2024, a record number of Maine voters passed by ballot initiative "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act").  *See* ECF Nos. 45-10 to 45-11.  The Act restricts individuals and entities from contributing more than $5,000 per year to any given PAC "for the purpose of making independent expenditures" supporting or opposing a clearly identified candidate for local or state office.  21-A M.R.S.A. §§ 1015(2-C)-(2-D), 1019-B(1)(A)-(B).[2] The Act correspondingly prohibits PACs from using funds contributed in excess of the limit to make independent expenditures.  *See id*. § 1019-B(6).  And finally, the Act requires PACs to disclose "the total contributions from each contributor" to an independent expenditure.  *Id.* § 1019-B(4)(B).

Dinner Table Action and For Our Future are Maine PACs that make independent expenditures.  *See* Declaration of Alex Titcomb (ECF No. 16-1) ¶¶ 8, 10-11, 13.  Both PACs receive a substantial amount of their funding from contributions that exceed the new limit, and For Our Future regularly contributes amounts exceeding the limit to other PACs such as Dinner Table Action.  *See id*. ¶¶ 18-19, 25, 37, 45.  The Act will severely curtail the ability of both PACs to raise and spend money to communicate their election views through independent expenditures or donations to other PACs making independent expenditures.  *See id*. ¶¶ 35-36, 45.

---

[2] Citations to the Maine Revised Statutes Annotated are to the version available on Westlaw, which, as of the date of this order, was current through emergency legislation Chapter 433 of the 2025 First Regular and First Special Sessions of the 132nd Legislature of Maine.

**Add. 2**

In December 2024, Dinner Table Action and For Our Future—along with their founder Alex Titcomb—filed a complaint against the members of the Maine Commission on Governmental Ethics and Election Practices[3] and Maine Attorney General Aaron M. Frey in their official capacities asserting that the Act violates the First and Fourteenth Amendments. *See* Complaint (ECF No. 1). They seek a declaration that the Act is unconstitutional on its face and/or as applied to them as well as a permanent injunction barring enforcement of the Act. *See id.* at 16.

At a conference early in the case, the parties proposed an abbreviated briefing schedule on the Plaintiffs' anticipated motion for a permanent injunction. *See* ECF No. 12. The State Defendants agreed to delay enforcement of the Act, which went into effect on December 25, 2024, until May 30, 2025, to allow time to resolve the case. *See id.* After the Plaintiffs had filed their motion (ECF No. 16), I permitted the nonpartisan fair elections organization EqualCitizens, ballot initiative proponents Cara and Peter McCormick, and Maine State Senator Richard A. Bennett to intervene and defend the Act. *See* ECF No. 51. The parties ultimately agreed that an evidentiary hearing was unnecessary to resolve the Plaintiffs' motion and that the matter was ready for final judgment on the merits. I held oral argument on May 22, 2025, *see* ECF No. 68, at which time the State Defendants agreed to further delay enforcement of the Act through July 15, 2025, *see* ECF No. 69 at 94.

---

[3] Namely, Chair William J. Schneider and members David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Beth N. Ahearn. *See* Complaint at 1.

**Add. 3**

## II.  Discussion

### A.  Contribution Limit

Because free debate of public issues and candidates is critical to our democratic system of governance, the First Amendment provides robust protections for political speech, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011), and "the financing and spending necessary to enable political speech," *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013).

When evaluating the constitutionality of laws restraining political speech, the Supreme Court distinguishes between limits on political expenditures and limits on political contributions.  *See Buckley v. Valeo*, 424 U.S. 1, 25, 44-45 (1976).  Limits on expenditures must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression," while limits on contributions will be upheld so long as they are closely drawn to further a sufficiently important state interest.  *Id.*  The only state interest important enough to outweigh the First Amendment's political speech protections is the state's interest in preventing quid pro quo corruption or its appearance.  *Ted Cruz for Senate*, 596 U.S. at 305.

Applying this framework, the Supreme Court struck down a limit on independent expenditures in *Citizens United*, holding that such expenditures "do not give rise to corruption or the appearance of corruption."  558 U.S. at 357.  The Court explained, "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid*

**Add. 4**

*pro quo* for improper commitments from the candidate." *Id.* (cleaned up); *see also Buckley*, 424 U.S. at 47 (noting that "independent advocacy" has a "substantially diminished potential for abuse"); *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 751 ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The candidate-funding circuit is broken. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned." (cleaned up)).

The question in this case is whether the Supreme Court's decision in *Citizens United* forecloses a state's ability to limit contributions to political groups making independent expenditures. Although this is an issue of first impression in the First Circuit, other courts have—as the Plaintiffs point out, *see* Motion at 10-11—been seemingly unanimous in holding that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to" independent expenditure groups. *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010); *see Wisc. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("[A]fter *Citizens United* there is *no* valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations."); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537-38 (5th Cir. 2013) ("[E]very federal court that has

considered the implications of *Citizens United* on independent [expenditure] groups
. . . has been in agreement: There is no difference in principle—at least where the
only asserted state interest is in preventing apparent or actual corruption—between
banning an [independent expenditure] organization . . . from engaging in advocacy
and banning it from seeking funds to engage in that advocacy (or giving funds to other
organizations to allow them to engage in advocacy on its behalf).”); *Republican Party
of N.M.*, 741 F.3d at 1103 (“[T]he question before us is whether political committees
that are not formally affiliated with a political party or candidate may receive
unlimited contributions for independent expenditures.  On this question the answer
is yes. . . . The Supreme Court has held that independent expenditures do not invoke
the anti-corruption rationale . . . .”); *N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483, 487 (2d Cir. 2013) (“The Supreme Court held in *Citizens United v. FEC*
that the government has no anti-corruption interest in limiting independent
expenditures.  It follows that a donor to an independent expenditure committee . . .
is even further removed from political candidates and may not be limited in his ability
to contribute to such committees.” (cleaned up)); *Alaska Pub. Offices Comm’n v.
Patrick*, 494 P.3d 53, 58 (Alaska 2021) (“Given the Supreme Court’s holding that
preventing quid pro corruption and its appearance is the only legitimate
governmental interest for campaign finance regulations and its holding that
independent expenditures do not give rise to quid pro quo corruption or its
appearance, there is no logical rationale for limiting contributions to independent
expenditure groups.”); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293

(4th Cir. 2008) (holding, prior to *Citizens United*, that "it is implausible that contributions to independent expenditure political committees are corrupting" and declaring unconstitutional a limit on such contributions (cleaned up)).

Notwithstanding the fact that "[f]ew contested legal questions" have been "answered so consistently by so many courts and judges," *N.Y. Progress & Prot. PAC*, 733 F.3d at 488, the Defendants maintain that these cases "were wrongly decided." State Defendants' Opposition (ECF No. 45) at 13; Intervenor Defendants' Opposition (ECF No. 53) at 5. They insist that *Citizens United* is inapposite because it involved a limit on expenditures that was subject to more intense scrutiny than the limit on contributions at issue here.

The Defendants' primary argument is that the Act is constitutional because it is closely drawn to serve "Maine's interest in stopping quid pro quo corruption by preventing candidates from trading official acts for contributions to Super PACs aligned with their campaigns." State Defendants' Opposition at 8. They point to two criminal cases involving political "candidates and contributors allegedly using a Super PAC to further illegal quid pro quo arrangements." *Id.* at 9; ECF Nos. 45-6 to 45-8. And they emphasize that just because "SuperPACs *make* 'independent expenditures' does not ensure that they *receive* independent contributions free from quid-pro-quo corruption." Intervenor Defendants' Opposition at 5.

Even accepting that contributions to independent expenditure PACs can serve as the quid in a quid pro quo arrangement, however, I am not persuaded that the Defendants' arguments on this point can be squared with *Citizens United*. I do not

read the Supreme Court as suggesting that independent expenditures are wholly incorruptible, but rather that they are sufficiently removed from the candidate so that the danger of such corruption is "substantially diminished" to the point that the government's "anticorruption interest is not sufficient to displace" First Amendment protections. *Citizens United*, 558 U.S. at 357 (cleaned up). Given that contributions to independent expenditures are one step further removed from the candidate, the logic of *Citizens United* dictates that the danger of corruption is smaller still. That being the case, there "is no logical scenario in which making a contribution to a group that will then make an expenditure is more prone to quid pro quo corruption than the expenditure itself." *Alaska Pub. Offices Comm'n*, 494 P.3d at 58.

The Defendants also suggest that the Act is closely drawn to further Maine's interest in preventing the appearance of corruption. They contend that "the Maine electorate's overwhelming" approval of the Act supports the notion that the public perceives large contributions to independent expenditure PACs as corrupting. Intervenor Defendants' Opposition at 7; *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 394 (2000) ("[A]lthough majority votes do not, as such, defeat First Amendment protections, the statewide vote on Proposition A certainly attested to the perception relied on here: An overwhelming 74 percent of the voters of Missouri determined that [campaign] contributions limits are necessary to combat corruption and the appearance thereof." (cleaned up)). They also provide the results of a survey that, according to them, shows "a clear majority" of citizens "believe that quid-pro-quo

corruption is likely to occur" when such contributions exceed $5,000. Intervenor Defendants' Opposition at 6-7; ECF No. 53-3.

Justice Stevens made similar points in *Citizens United* when dissenting from the majority's opinion striking down limits on corporate independent expenditures. He criticized the majority for ignoring the "significant evidence" that such expenditures were, at the very least, susceptible to the appearance of corruption and warned that the Court's holding would result in "cynicism and disenchantment" among voters and "and an increased perception that large spenders call the tune." *Citizens United*, 558 U.S. at 457, 470 (Stevens, J., dissenting) (cleaned up). The majority, however, was unmoved, saying,

> By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials. This is inconsistent with any suggestion that the electorate will refuse to take part in democratic governance because of additional political speech made by a corporation or any other speaker.

*Id.* at 360 (cleaned up).

If the government's interest in combatting the appearance of corruption was not enough to justify limits on independent expenditures, it stands to reason that the same interest is not enough to justify limits on contributions to independent expenditures. Thus, even accepting the Defendants' assertions about public perception, their arguments on this point once again fail under the Supreme Court's reasoning in *Citizens United*.

Finally, the Defendants argue that the Act is constitutional because it is closely

drawn to further Maine's interest in preventing dependence corruption—that is, the risk that elected officials will become dependent on constituencies disconnected from the electorate. *See* Intervenor Defendants' Opposition at 8-17. They assert that the First Amendment, as it was originally understood by the Framers, allows for the regulation of dependence corruption in addition to quid pro quo corruption. *See id.* I need not address this argument further or resolve the disagreements of the parties' competing constitutional historians because, as discussed, the Supreme Court has been clear that the only interest it recognizes as sufficient to justify limits on political speech is the government's interest in preventing quid pro quo corruption. *See Ted Cruz for Senate*, 596 U.S. at 305. Even the Defendants acknowledge that I am bound to follow Supreme Court precedent on this point and admit that their argument is primarily intended to preserve the issue for subsequent levels of review. *See* Intervenor Defendants' Opposition at 9-10 n.3.

At bottom, I agree with other courts that, regardless of whether strict or intermediate scrutiny applies, *Citizens United* forecloses limits on contributions to independent expenditure groups. *See, e.g.*, *SpeechNow.org*, 599 F.3d at 696 (holding that no "matter which standard of review governs contributions limits," contribution limits on independent expenditure groups "cannot stand" under *Citizens United*). The portions of the Act limiting contributions to PACs for the purposes of making independent expenditures—21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6)—violate the First Amendment on their face because there is no set of circumstances

where they could be applied constitutionally. *See Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 168 (1st Cir. 2024).

That leaves the question of injunctive relief. Granting a permanent injunction requires a court "to find that (1) plaintiffs prevail on the merits, (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

The Plaintiffs readily satisfy each of these factors.[4] They are prevailing on the merits; the loss of their First Amendment freedoms absent an injunction would be an irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976); the harm the Plaintiffs would face in losing their First Amendment freedoms outweighs the harm the Defendants will suffer from an injunction where the Defendants have failed to demonstrate a compelling state interest in limiting those freedoms; and, finally, the public's interest is served—rather than harmed—by enforcing the First Amendment, *see P.R. Assoc. of Mayors v. Vélez-Martínez*, 480 F. Supp. 3d 377, 379 (D.P.R. 2020).

---

[4] The Defendants suggest in passing that the Plaintiffs "cannot possibly be entitled to an injunction" because they did not specifically address all four of these factors in their motion. Intervenor Defendants' Opposition at 4. Where this case has focused almost entirely on the merits of the underlying constitutional issue and the Plaintiffs' entitlement to a permanent injunction is readily apparent, I decline to find that they waived their request.

11

**Add. 11**

Accordingly, I will permanently enjoin enforcement of 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), which are the portions of the Act limiting contributions to PACs for the purpose of making independent expenditures.

## B. Disclosure Requirements

The Plaintiffs also challenge the Act's separate requirement that a "person, party committee, or [PAC] that makes any independent expenditure in excess of $250 during any one candidate's election" disclose "the total contributions from each contributor" regardless of the amount of the contribution. 21-A M.R.S.A. § 1019-B(4)(B). Because Maine law did not previously require the disclosure of PAC contributions less than $50, *see* 21-A M.R.S.A. § 1060(6), Dinner Table Action avers that multiple of its smaller dollar amount contributors have indicated that they will not contribute as they have done in the past if their identities will be publicly revealed. *See* Declaration of Alex Titcomb ¶¶ 27-29.

Although disclaimer "and disclosure requirements may burden the ability to speak" and associate, they "impose no ceiling on campaign-related activities and do not prevent anyone from speaking" or associating. *Citizens United*, 558 U.S. at 366 (cleaned up). Accordingly, such requirements are not subject to strict scrutiny but instead "to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 366-67 (cleaned up). In this context, the government's interest is not limited just to preventing quid pro quo corruption—rather, the Supreme Court has said that the government has an important interest "in provid[ing] the electorate with information

and insur[ing] that the voters are fully informed about the person or group who is speaking." *Id.* at 368 (cleaned up). Nevertheless, disclosure requirements must be narrowly tailored to this informational interest, which requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

Maine's "interest in an informed electorate is sufficiently important to satisfy the first imperative of exacting scrutiny." *Gaspee Project v. Mederos*, 13 F.4th 79, 88 (1st Cir. 2021).[5] That leaves the question of whether the Act's disclosure requirement is narrowly tailored to that interest.

On this point, the First Circuit's decision in *Gaspee Project* is instructive. The Rhode Island law at issue in that case required, among other things, that covered organizations disclose donors of over $1,000. *See id.* at 83. The First Circuit found that the law was "narrowly tailored enough to avoid any First Amendment infirmity" because it was limited to organizations that spent $1,000 or more on independent expenditures within one calendar year and "provide[d] off-ramps for individuals who wish to engage in some form of political speech but prefer to avoid attribution." *Id.* at 88-90. Those off-ramps included "choos[ing] to contribute less than $1,000" or taking advantage of the law's provision allowing donors "to opt out of their monies being used for independent expenditures." *Id.* at 89. "Taken together," the First

---

[5] The Defendants also argue that the disclosure requirement is sufficiently related to Maine's interest in preventing corruption. *See* State Defendants' Opposition at 18. But as discussed above, Maine's anticorruption interest is not sufficient to displace First Amendment protections in the context of independent expenditures. As such, I will focus on Maine's informational interest.

**Add. 13**

Circuit concluded, "these limitations on the [law's] reach only require disclosure of relatively large donors who choose to engage in election-related speech." *Id.*

The disclosure requirement here is not nearly so constrained. Although the Act is somewhat limited by the fact that it only requires disclosure of contributions to an independent expenditure if the expenditure exceeds $250, it has no explicit opt out provision for contributors who do not wish to fund independent expenditures, and, most importantly, it requires the disclosure of contributors who give even very small amounts of money. *Cf. Wy. Gun Owners v. Gray*, 83 F.4th 1224, 1249 (10th Cir. 2023) ("[T]he First Circuit's suggestion [in *Gaspee Project*] that wary donors should just contribute less than $1,000 strikes us as an unacceptable ask here, where the disclosure requirements trigger at a *$100* donation.").

Where the Act's disclosure requirement sweeps so broadly and provides no meaningful opportunity for anonymous contributions, it cannot be described as narrowly tailored to Maine's informational interest.[6] In such circumstances, the disclosure requirement is facially unconstitutional because it risks chilling contributors' rights to speak and associate, and that risk "is enough because First Amendment freedoms need breathing space to survive." *Ams. for Prosperity Found.*, 594 U.S. at 618-19 (cleaned up); *see id.* at 617-18 (concluding that a disclosure

---

[6] I offer no general opinion as to what constitutes a reasonable dollar amount threshold for disclosure requirements, only that, in the specific circumstances of this case, the zero dollar threshold is not narrowly tailored to further Maine's informational interest.

requirement that "indiscriminately swe[pt] up information" of donors who might wish to remain anonymous was "facially unconstitutional"). [7]

Accordingly, under the same permanent injunction analysis outlined above, I will enjoin enforcement of the portion of 21-A M.R.S.A. § 1019-B(4)(B) that requires an itemized account of "the total contributions from each contributor." (This quoted language is the language that the Act added to section 1019-B(4)(B)—the State Defendants remain free to enforce the remaining portions of the statute.)

### III. Conclusion

In summary, the Plaintiffs' motion (ECF No. 16) is **GRANTED**. "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" is declared unconstitutional on its face. As such, the State Defendants are permanently enjoined from enforcing 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), and the portion of 21-A M.R.S.A. § 1019-B(4)(B) requiring an itemized account of "the total contributions from each contributor." Judgment shall enter for the Plaintiffs.

**SO ORDERED**.

Dated: July 15, 2025

/s/ Karen Frink Wolf
United States Magistrate Judge

---

[7] In light of my conclusion that the Act violates the First Amendment, I need not address the Plaintiffs' alternative argument that it also violates the Fourteenth Amendment's Equal Protection Clause. *See* Motion at 12-15.

**Add. 15**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DINNER TABLE ACTION, et al.,        )
                                    )
         Plaintiffs,                )
                                    )
v.                                  )        CIVIL NO. 1:24-cv-00430-KFW
                                    )
WILLIAM J. SCHNEIDER, et al.,       )
                                    )
         Defendants,                )

## JUDGMENT

In accordance with the Order granting Motion for Permanent Injunction (ECF No.

74) entered by Magistrate Judge Karen Frink Wolf on July 15, 2025,

JUDGMENT is hereby entered for the Plaintiffs and against the Defendants.

ERIC M. STORMS
ACTING CLERK

By: /s/ Nicholas Gordon
Deputy Clerk

Dated: July 15, 2025

**Add. 16**