No. 25-1705

# United States Court of Appeals
## For the First Circuit

No. 25-1705

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs – Appellees

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the
Maine Commission on Governmental Ethics and Election Practices;
DAVID R. HASTINGS, III, in the official capacity as a Member of the
Maine Commission on Governmental Ethics and Election Practices;
DENNIS MARBLE, in the official capacity as Member of the Maine
Commission on Governmental Ethics and Election Practices; BETH N.
AHEARN, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices; AARON
M. FREY, in the official capacity as Attorney General of Maine; SARAH
E. LECLAIRE, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices,

Defendants – Appellants

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK;
RICHARD A. BENNETT;

Defendants.

*On appeal from the United States District Court, District of Maine*

———————

No. 25-1706

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

Plaintiffs – Appellees,

v.

EQUAL CITIZENS; CARA MCCORMIC; PETER MCCORMICK; RICHARD A. BENNETT,

Defendants – Appellants,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants.

## REPLY BRIEF OF DEFENDANTS-APPELLANTS WILLIAM J. SCHNEIDER, DAVID R. HASTINGS, III, DENNIS MARBLE, BETH N. AHEARN, AARON M. FREY, and SARAH E. LECLAIRE

AARON M. FREY
Attorney General

Thomas A. Knowlton
Deputy Attorney General

Of Counsel

Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207) 626-8800
jonathan.bolton@maine.gov
*Attorneys for Appellants*

# Table of Contents

Table of Contents ...............................................................................................i

Table of Authorities............................................................................................ii

Preliminary Statement ......................................................................................1

Reply Argument ................................................................................................4

I. The district court erred in concluding that the Act's contribution limits are unconstitutional as a matter of law. ..............................4

    A. The Act's contribution limits are not subject to strict scrutiny...................................................................................4

    B. The Act passes exacting scrutiny...........................................6

    C. Dinner Table's proposed alternate ground for affirmance should be rejected................................................................15

II. The district court erred in concluding that the Act's disclosure requirement is unconstitutional. ...............................................19

III. Any portions of the Act determined to be unconstitutional should be severed. ...............................................................................24

Conclusion ....................................................................................................25

Certificate of Compliance with Rule 32(a)...........................................26

Certificate of Service Form for Electronic Filing..................................27

# Table of Authorities

## CASES

*Alaska Pub. Offs. Comm'n v. Patrick,*
494 P.3d 53 (Alaska 2021) ......................................................................8

*Americans for Prosperity Foundation v. Bonta,*
594 U.S. 595 (2021) ................................................................21, 22, 24

*Anh Cao v. Fed. Election Comm'n,*
688 F. Supp. 2d 498 (E.D. La. 2010)...................................................18

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ...............................................................................16

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio),*
459 U.S. 87 (1982)..................................................................................22

*Buckley v. Valeo,*
424 U.S. 1 (1976).......................................................... 5, 6, 11, 14, 16

*California Med. Ass'n v. Fed. Elec. Comm'n,*
453 U.S. 182 (1981)...........................................................................5, 11

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.,* 454 U.S. 290 (1981) ......................................................................23

*Citizens United v. FEC,*
558 U.S. 310 (2010)................................................. 2, 6, 14, 20, 21, 22

*Daggett v. Comm'n on Gov't Ethics and Elec. Pracs.,*
205 F.3d 445 (1st Cir. 2000) ..........................................................21, 23

*Fam. PAC v. McKenna,*
685 F.3d 800 (9th Cir. 2012) ...........................................................5, 23

*FEC v. National Conservative Political Action Committee,*
470 U.S. 480 (1985) ...............................................................................10

*FEC v. Wis. Right to Life, Inc.,*
551 U.S. 449 (2007) ...............................................................................14

*Fed. Election Comm'n v. Beaumont,*
    539 U.S. 146 (2003) ........................................................ 4, 5, 12

*Fed. Election Comm'n v. Nat'l Right to Work Comm.,*
    459 U.S. 197 (1982) ................................................................ 14

*Gaspee Project v. Mederos,*
    13 F.4th 79 (1st Cir. 2021) ................................................ 19, 24

*Ill. Liberty PAC v. Madigan,*
    902 F. Supp. 2d 1113 (N.D. Ill. 2012) ................................... 18

*Long Beach Area Chamber of Commerce v. City of Long Beach,*
    603 F.3d 684 (9th Cir. 2010) ................................................... 7

*McCoy v. Mass. Ins. of Tech.,*
    950 F.2d 13 (1st Cir. 1991) ...................................................... 12

*McCutcheon v. FEC,*
    572 U.S. 185 (2014) ................................................................ 12

*N.C. Right to Life, Inc. v. Leake,*
    525 F.3d 274 (4th Cir. 2008) ..................................................... 7

*N.Y. Progress & Prot. v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ...................................................... 7

*New Hampshire Right to Life Political Action Committee v. Gardner,*
    99 F.3d 8 (1st Cir. 1996) ......................................................... 20

*Randall v. Sorrell,*
    548 U.S. 230 (2006) .......................................................... 17, 18

*Republican Party of N.M. v. King,*
    741 F.3d 1089 (10th Cir. 2013) ................................................. 7

*SpeechNow.org v. FEC,*
    599 F.3d 686 (D.C. Cir. 2010) ............................................. 7, 13

*Texans for Free Enter. v. Texas Ethics Comm'n,*
    732 F.3d 535 (5th Cir. 2013) ..................................................... 7

*United States v. Lindberg*, No. 519-CR-00022MOCDSC,
    2020 WL 520948 (W.D.N.C. Jan. 31, 2020)..........................................13

*United States v. Wanda Vazquez-Garced*, Crim. No. 22-342 (SCC),
    ECF No. 498 (D.P.R. Mar. 7, 2024) ...................................................13

*Untied States v. Menendez*,
    291 F. Supp. 3d 606 (D.N.J. 2018).....................................................13

*Upstate Jobs Party v. Kosinski*,
    106 F.4th 232 (2d Cir. 2024)...............................................................18

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015) ....................................................................... 16, 23

*Wisc. Right to Life State PAC v. Barland*,
    664 F.3d 139 (7th Cir. 2011)..................................................................7

*Worley v. Fla. Sec'y of State*,
    717 F.3d 1238 (11th Cir. 2013)............................................................23

## STATUTES

21-A M.R.S.A. §§ 301–303..................................................................19

21-A M.R.S.A. § 301 ...........................................................................19

21-A M.R.S.A. § 331 ...........................................................................19

21-A M.R.S.A. § 1015 .........................................................................14

21-A M.R.S.A. § 1052 ...........................................................................4

**Preliminary Statement**

Plaintiffs-Appellees Dinner Table Action, For Our Future, and Alex Titcomb (together, "Dinner Table") defend the district court's invalidation of Maine's voter-enacted limits on contributions to super PACs (the "Act") primarily through a bare appeal to authority. Courts in other jurisdictions have agreed with the district court's reasoning, says Dinner Table, so this Court should too.

But, as the Defendants-Appellants state officials (together "Maine") demonstrated in their principal brief, those decisions, mostly issued in a cluster between 2008 and 2013, failed to anticipate the fundamental transformation of how money flows into U.S. elections that they unleashed. The independent-expenditure committees known as super PACs, which did not even exist at the federal level in 2008, are now a dominant means of influencing U.S. elections. The resulting opportunities for quid pro quo deals between donors and the candidates who directly benefit from super PAC spending have become apparent in 2026 in a manner that they were not in 2008 or 2010. With the benefit of hindsight, the Court should take a fresh look at the legal question

1

posed in this case and not simply rely on outdated precedents from other jurisdictions.

At bottom, Dinner Table's (and its supporting amicus's) legal defense of the district court's decision is grounded in the notion that *Citizens United v. FEC*, 558 U.S. 310 (2010), in holding that the government cannot outright ban political speech in the form of independent expenditures (IEs), implicitly also forbade placing any sort of limits on even mere transfers of money to the groups that make those IEs. This argument ignores both the lower level of constitutional scrutiny applicable to contribution limits and the greater likelihood of corrupt deals between candidate and *donor*—with the super PAC serving as merely an unwitting conduit—as opposed to such deals between candidate and the PAC itself. *Citizens United*, which concluded that an outright ban on IEs was "asymmetrical" to the government's anti-corruption interest, *id.* at 361, does not foreclose consideration of these differences.

The Court should also reject Dinner Table's alternate ground of affirmance, alleging that the Act is underinclusive because it fails to regulate contributions to political parties. Even under strict scrutiny,

which does not apply here, the government is not required to solve all aspects of a problem at once. And given the special associational interests unique to political parties, the Act's progenitors had good reason to be cautious about expanding the Act to cover such transactions.

Dinner Table also fails to rebut Maine's argument that, even if the Act's contribution limits are unconstitutional, the Act's severable requirement that the IE reports already required by state law list contributions used for the reported IEs should remain standing. Among other things, Dinner Table fails to offer any authority countering the decisions by the Supreme Court, this Court, and others endorsing zero-dollar or very low-dollar disclosure thresholds as serving an important governmental interest in providing voters with information about candidates' sources of support. Simply put, when voters are subjected to advertising urging them to vote for or against a candidate, they should be able to find out who provided the funds used for that advertisement.

The Court should reject Dinner Table's arguments and reverse the district court's decision.

<center>**Reply Argument**</center>

I. **The district court erred in concluding that the Act's contribution limits are unconstitutional as a matter of law.**

    A. **The Act's contribution limits are not subject to strict scrutiny.**

Maine demonstrated in its principal brief that, because the Act regulates contributions and not expenditures, it is subject to the "relatively complaisant" level of First Amendment scrutiny known as "exacting" or "closely drawn" scrutiny. Maine Br. at 23–26; *Fed. Election Comm'n v. Beaumont,* 539 U.S. 146, 161 (2003). In response, Dinner Table makes a cursory argument that the Act should be subject to strict scrutiny, asserting, without authority, that "a donation for an independent expenditure is an independent expenditure." Dinner Table Br. at 25.

Dinner Table's argument is mistaken. Maine law defines contributions and expenditures differently. Generally, a "contribution" is money or something else of value "made to or received by a committee," while an expenditure must be "made for the purpose of initiating or influencing a campaign." *Compare* 21-A M.R.S.A. § 1052(3)(A) *with* § 1052(4)(A)(1) (Westlaw Jan. 23, 2026). In other words, contributions finance someone else's speech, while expenditures

<center>4</center>

finance the spender's own speech. This difference is the same one relied upon by the Supreme Court in recognizing that "contributions lie closer to the edges than to the core of political expression." *Beaumont*, 539 U.S. at 161; *see Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (recognizing that the "transformation of contributions into political debate involves speech by someone other than the contributor."); *California Med. Ass'n v. Fed. Elec. Comm'n*, 453 U.S. 182, 196 (1981) (Marshall, J.) (plurality op.) (referring to contributions to PACs as "speech by proxy" not entitled to "full First Amendment protection").

The reasoning of these decisions makes clear that the lower level of scrutiny for contribution limits is grounded in the relative lack of expressive content in the mere transfer of money from one party to another. Whether the contributions at issue are supposed to be "independent" of candidates, Dinner Table Br. at 25, is irrelevant to the proper level of scrutiny. *See California Med. Ass'n*, 453 U.S. at 195 (plurality op.); *cf. Fam. PAC v. McKenna*, 685 F.3d 800, 811–12 (9th Cir. 2012) (holding that the lower court erred by applying strict scrutiny to ballot-question contribution limits). Here, because the Act regulates

only contributions, and not expenditures, it is subject to exacting scrutiny.

### B. The Act passes exacting scrutiny.

Maine's principal brief demonstrated that *Citizens United*—a case considering whether independent *expenditures* risked quid pro quo corruption—does not control the question of whether *contributions* to entities that make such expenditures pose a sufficient risk of quid pro quo corruption to justify regulation. Maine Br. at 26–35. Put simply, the Act regulates a problem that is far closer to one that led *Buckley* to uphold candidate contribution limits, *see Buckley*, 424 U.S. at 23–35, than the one that led *Citizens United* to strike down an "outright" IE ban, *see Citizens United*, 558 U.S. at 337: the problem of candidates engaging in corrupt deals with their biggest donors (and the appearance of such corruption). The only difference from *Buckley* is that the transaction regulated by the Act involves an intermediary—a super PAC—that is outside of the control of the candidate. But where the super PAC's goal is to elect the candidate (and is perhaps run by a close associate of the candidate), the candidate's lack of control over the super PAC's spending is immaterial. The candidate still knows that they will

benefit from the donor's contributions.  The risk of corrupt dealings is virtually the same.

In defending the district court's conclusion, Dinner Table points to the same list of decisions from other jurisdictions offered by the district court.  Dinner Table Br. at 26–28.  But Dinner Table fails to engage with Maine's point that those decisions reflect a misunderstanding of *Citizens United* as a categorical holding that the government may not regulate IEs when, in fact, it holds that the government's interest in banning IEs failed strict scrutiny.  Maine Br. at 28–31.  The Act, as shown above, is not subject to strict scrutiny.  And, precisely because it targets contributions rather than expenditures, it better addresses the long-recognized risk of quo pro quo corruption between donor and candidate than the IE ban at issue in *Citizens United.*

The Court should also note the dates of most of the decisions on which Dinner Table relies: 2008, 2010, 2011, 2013.[1]  Super PACs at the

---

[1] *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008); *SpeechNow.org v. FEC*, 599 F.3d 686, 692 (D.C. Cir. 2010) (en banc); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010); *Wisc. Right to Life State PAC v. Barland*, 664 F.3d 139, 155 (7th Cir. 2011); *N.Y. Progress & Prot. v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 538 (5th Cir. 2013); *Republican Party of N.M. v. King*, 741 F.3d 1089, 1103 (10th Cir. 2013).

federal level did not exist until *SpeechNow.org* allowed for their creation in 2010.  These courts thus considered the risk of corruption from contributions to fund IEs in an era in which super PACs were in their infancy or did not exist at all.  This Court, in contrast, has the benefit of considering how the explosion of money flowing to super PACs in the 15 years since *SpeechNow*, JA69–76, has created opportunities for quid pro quo corruption of which most of the courts issuing the decisions cited by Dinner Table could not have imagined.

Dinner Table, like the district court, relies on the reasoning of *Alaska Public Offices Commission v. Patrick*, 494 P.3d 53, 58 (Alaska 2021), which asserts that contributions to super PACs are "more attenuated" from the risk of quid pro quo corruption.  Dinner Table Br. at 28–29.  But as Maine has already explained, *see* Maine Br.  at 32–33, that assertion ignores reality.  It is *donors*—not the professionals who operate many super PACs—who are likely to seek quid pro quo deals with candidates.  Indeed, that was the alleged arrangement at issue in the Menendez prosecution and the other examples that Maine has cited. *See* Maine Br. at 37–38.

The Act cannot be construed as an effort to "silence critics and opponents of the government." Dinner Table Br. at 29. Nor does it prevent people from "combin[ing] to engage in independent speech." *Id.*; *see also* Chamber of Com. Amicus Br. at 10. The Act places no limits on how much PACs or individuals can spend on IEs to influence Maine elections. Maine Br., Add. at 17–18. Nor does it provide an aggregate limit on contributions that individuals may make to various PACs and other speakers that share their views. *Id.* It merely limits donors to giving no more than $5,000—an amount beyond the means of the vast majority of Mainers—to a particular PAC for IEs during a particular calendar year.

Dinner Table PAC itself is the perfect example showing that these generous limits do not meaningfully restrict people from "combining" to engage in speech. The record shows that during the 2022 and 2024 election cycles Dinner Table took in over $600,000—approximately half of total dollars received—from sub-$5,000 donations. JA58. These contributors will be entirely unaffected by the Act. In contrast, Dinner Table received a total of only 12 contributions exceeding $5,000 during the same period. JA58, 62. And even that handful of large contributors

could, under the Act, still contribute large sums to Dinner Table PAC and redirect any excess to other like-minded PACs.  These are minimal restrictions on First Amendment protected activity.

Dinner Table's reliance on *FEC v. National Conservative Political Action Committee ("NCPAC")*, 470 U.S. 480 (1985), *see* Dinner Table Br. at 30–31, which struck down limitations on IEs supporting presidential candidates who receive public funds, is misguided.  The law at issue in that case restricted "expenditures by PACs, not on the contributions they receive."  470 U.S. at 495.  Indeed, the Court was especially concerned that the challenged law's severe cap on IEs would effectively restrict the influence of those contributing very small amounts to the PAC—which it contrasted with "the sizable contributions involved in *California Medical Assn.*"  *Id.*  The Act at issue here *only* regulates "sizable contributions"; the small contributions that were of concern in *NCPAC* are left entirely untouched by the Act.  *See* Maine Br., Add. at 17–18.

Moreover, *NCPAC*'s dismissal of the possibility that IEs will produce quid pro quo corruption as a "hypothetical possibility," 470 U.S. at 498; *see* Dinner Table Br. at 30–31, anticipates the holding of

10

*Citizens United* that direct restrictions on IEs fail strict scrutiny as a matter of law. But *NCPAC* does not control here. Because *NCPAC* considered an expenditure restriction applicable to PACs funded predominately by small contributions, it had no occasion to consider whether massive contributions to PACs dedicated to electing candidates through IEs might themselves create a risk of quid pro quo corruption. The ability to make such massive contributions to super PACs creates far more than a "hypothetical possibility" of quid pro quo corruption. JA79–104.

Dinner Table cites *Buckley* and a question asked in the *SpeechNow* oral argument for the proposition that the governmental interest in regulating contributions does not extend beyond contributions directly to candidates. Dinner Table Br. at 31–32. As already noted, *California Medical Association*, upholding a law that regulated contributions to multi-candidate PACs, indicates otherwise. 453 U.S. at 194–99 (plurality op.). In any event, Maine is not arguing that contributions to "a retirement plan" or a "literary anthology," Dinner Table Br. at 31, could be properly limited based on the government's anti-corruption interest. It is arguing that contributions

specifically to PACs that make IEs to elect candidates to office can be limited because, unlike Dinner Table's examples, those contributions *do* implicate the government's anti-corruption interest. Moreover, because the Act regulates only those monetary transactions, which have limited expressive content, *see Beaumont*, 539 U.S. at 161–62, the strength of that anti-corruption interest is measured under exacting scrutiny, not strict scrutiny.

Dinner Table further suggests that the Supreme Court has "approving cited *Speechnow.org*." Dinner Table Br. at 33 (citing *McCutcheon v. FEC*, 572 U.S. 185, 193 n.2 (2014)). But that footnote merely refers to *SpeechNow* in order to explain factually how super PACs work. It cannot be read to endorse the holding of *SpeechNow*, even as dicta. Dinner Table's caselaw concerning the authority of Supreme Court dicta, Dinner Table Br. at 33 (citing *McCoy v. Mass. Ins. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991)), is therefore inapplicable.

Dinner Table also takes issue with Maine's citation to the Menendez and Householder criminal cases as examples of potential quid pro quo corruption involving contributions to super PACs. Dinner Table Br. at 34. While Menendez was not convicted, the fact that the

indictment was brought at all—and survived a legal challenge, *see United States v. Menendez*, 291 F. Supp. 3d 606, 623 (D.N.J. 2018)— refutes the tautology employed by *SpeechNow* that, because IEs cannot as a matter of law corrupt, neither can contributions to entities that make IEs. *See SpeechNow*, 599 F.3d at 695. With regard to the Householder case, Dinner Table is mistaken that a super PAC was not involved in the scheme. While a 501(c)(4) entity was *also* part of the scheme, it was a super PAC, the Growth and Opportunity PAC, that made the campaign expenditures contemplated by the scheme. *See Ohio v. Firstenergy Corp.*, Complaint ¶ 51, available at https://tinyurl.com/47x2ru7x (last visited Jan. 23, 2026); Rick Rouan, "How dark money fueled Larry Householder's campaign for Ohio House speaker," *The Columbus Dispatch* (July 29, 2020), *available at* https://tinyurl.com/49pmmnyh; FEC, "Growth and Opportunity PAC, Inc.," at https://tinyurl.com/59dns83s (last visited Jan. 23, 2026).[2]

---

[2] Dinner Table offers no response to the two other cases cited by Maine in its principal brief: *United States v. Wanda Vazquez-Garced*, Crim. No. 22-342 (SCC), ECF No. 498 at 20 (D.P.R. Mar. 7, 2024) & *United States v. Lindberg*, No. 519-CR-00022MOCDSC, 2020 WL 520948, at *2 (W.D.N.C. Jan. 31, 2020), both of which involved courts declining to dismiss bribery indictments involving alleged funneling of money to super PACs.

That Maine has a law providing that contributions made to single-candidate PACs at the behest of the candidate are deemed contributions to the candidate, *see* 21-A M.R.S.A. § 1015(4) (Westlaw Jan. 23, 2026), does not establish that the Act is overbroad. *See* Dinner Table Br. at 35. It is extremely difficult for a regulator to probe the existence of deals between candidates and donors made behind closed doors. As the Supreme Court has observed, "the scope of such pernicious practices can never be reliably ascertained." *Citizens United*, 558 U.S. at 356 (quoting *Buckley*, 424 U.S. at 27). That is why, under exacting scrutiny, states are permitted to take a "prophylactic" approach to preventing corruption and its appearance, in which some innocuous conduct is regulated to "ensure against the reality or appearance of corruption." *Id.*; *see Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982) ("Nor will we second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared").

The Act is thus not a "prophylaxis-upon-prophylaxis approach." *See* Dinner Table Br. 35 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 479 (2007)). Maine's pre-existing law recognizing that

14

contributions made to a single-candidate super PAC at the request of the benefiting candidate are functionally indistinguishable from contributions to the candidate is not so much a "prophylaxis" as it is an acknowledgement of reality. And, even if it were a "prophylaxis," Dinner Table asserts that such an approach is barred under "strict scrutiny," *see* Dinner Table Br. at 35, which is not the correct level of scrutiny here. *See* Part I.A., *supra*.

In short, the Court should reject Dinner Table's arguments and conclude that the district court erred in concluding that the Act violates the First Amendment.

### C. Dinner Table's proposed alternate ground for affirmance should be rejected.

Dinner Table also raises an argument that the District Court did not consider: that "the exclusion of party committees from the Act's coverage shows a lack of adequate tailoring." Dinner Table Br. at 36. Specifically, Dinner Table argues that the Act is underinclusive because it does not also limit contributions made to political parties for the purpose of IEs. The Court should reject this alternative argument for affirmance.

As the Supreme Court has explained in the campaign-finance

context, "the First Amendment imposes no freestanding 'underinclusiveness limitation.'":

> A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests.

*Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015); *accord Buckley*, 424 U.S. at 105. Underinclusiveness is relevant to the constitutional analysis not because it is inherently problematic but because it can raise "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Williams-Yulee*, 575 U.S. at 448 (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011)).

Here, there can be no doubt that the Act is directed at corruption, and not at disfavoring any speaker or viewpoint. The Act targets an aspect of the election system that is vulnerable to corruption, as shown above: trading official acts for contributions to super PACs that can serve as de facto campaign entities for specific candidates or groups of candidates. Moreover, the Act has no partisan bent, as evidenced by

the proliferation of super PACs across party lines, JA76, and the huge margin of victory of the Act at the polls, JA156.

Initiators and voters could have reasonably believed that the risk of super PAC–related corruption is substantially greater than the risk of party-related corruption. Parties exist to elect their members to office. For a major party, that means supporting potentially hundreds of candidates in a given election. Super PACs, in contrast, can be much more selective in the candidates that they support, sometimes supporting only a single candidate. *See* JA69 (showing that 40.9% of federal super PACs supported a single candidate in 2024). It is reasonable to expect that candidates seeking quid pro quo arrangements with contributors would be more likely to select a super PAC with a narrow focus on their candidacy as the vehicle for their scheme.

The Act's proponents also had good reason to be cautious about extending it to political parties. The Supreme Court has recognized that the right to associate with a political party is a "particularly important political right." *Randall v. Sorrell*, 548 U.S. 230, 256 (2006) (plurality op.) (Breyer, J.). The *Randall* plurality recognized "the need

17

to allow individuals to participate in the political process by contributing to political parties that help elect candidates," striking down Vermont's limits in part because the law, "to an unusual degree, . . . would discourage those who wish to contribute small amounts of money to a party." *Id.* Lower courts have also suggested that political parties may be entitled to heightened constitutional protection from campaign finance restrictions. *Ill. Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113, 1123 (N.D. Ill. 2012) (observing that the predominant view of then-sitting Supreme Court Justices is that "the First Amendment *requires* that political parties be treated more favorably than non-party contributors"); *Anh Cao v. Fed. Election Comm'n*, 688 F. Supp. 2d 498, 547 (E.D. La. 2010) ("The unique purpose of parties, as compared to other political associations like PACs, arguably entitles it to heightened constitutional protection"); *see also Upstate Jobs Party v. Kosinski*, 106 F.4th 232, 246 (2d Cir. 2024) (upholding law imposing lower contribution limits on independent bodies than on political parties).

Maine law similarly recognizes the distinct nature of parties. To qualify as a party in Maine, a group must demonstrate a significant

base of public support.  *See* 21-A M.R.S.A. §§ 301–303 (Westlaw Jan. 23, 2026).  Once qualified, parties must hold various public proceedings, such biennial municipal caucuses, *see id.* § 301(1)(A), and state conventions, *see id.* § 301(1)(B).  In exchange, parties are granted easier ballot access.  *See id.* § 331.  Given the close associational links between parties, their members, and their candidates, and the quasi-public nature of parties, they are not similarly situated to PACs and it is reasonable—indeed, possibly even constitutionality required—for state law to treat contributions to parties differently.

**II.    The district court erred in concluding that the Act's disclosure requirement is unconstitutional.**

Maine also demonstrated in its principal brief that the Act's disclosure requirements satisfied the "exacting scrutiny" applicable to such requirements.  Maine Br. at 47–52; *see Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021).  Under this standard, the state need not use the least restrictive means to achieve its ends; only a "reasonable fit" is required.  *Id.* at 88.

Dinner Table makes several arguments in response.  First, Dinner Table argues that the reporting requirement is "unnecessary" if the contribution limits themselves are struck down.  Dinner Table Br. at 47.

19

Maine, of course, contends that the District Court erred in striking down those contribution limits. *See* Part I, *supra.* But if the Court disagrees and upholds the district court, that would make the disclosure requirements *more* important, not less, since it would at least provide voters with increased transparency about transactions that the State would be otherwise unable to regulate.

This Court's decision in *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8 (1st Cir. 1996), does not suggest otherwise. *See* Dinner Table Br. at 47. The provision invalidated in that decision was a requirement that PACs certify that they would comply with a $1,000 limit on IEs that this Court separately concluded was unconstitutional. *Gardner*, 99 F.3d at 19. The government obviously cannot require individuals to certify they will refrain from violating an unconstitutional law. *Id.* In contrast, the government most certainly can require donors and PACs to disclose transactions that the government is nonetheless without constitutional authority to limit. *See Citizens United*, 558 U.S. at 371 (upholding disclosure requirements for IEs even though banning them outright was unconstitutional).

Dinner Table complains that the disclosure provision is "not necessary to prevent quid pro quo corruption." Dinner Table Br. at 48. But even if that were true, quid pro quo corruption is not the only valid governmental interest that can support disclosure requirements. *See Citizens United*, 558 U.S. at 369 (recognizing the public's interest in "knowing who is speaking about a candidate shortly before an election"); *Daggett v. Comm'n on Gov't Ethics & Elec. Pracs.*, 205 F.3d 445, 465–66 (1st Cir. 2000) (recognizing interest in "providing the electorate with information as to who supports a candidate and where political funding comes from"). Maine voters' overwhelming passage of the Act demonstrates, if nothing else, their deep concern about the increasing dominance of super PACs in elections. Robust disclosure of contributions, even if it is not paired with actual limits, furthers Maine's compelling interest in providing voters with full transparency concerning the sources of super PAC funding.

Dinner Table relies on *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), for the proposition that unduly broad disclosure requirements may interfere with freedom of association. Dinner Table Br. at 49. However, the disclosure requirement in *Bonta*

was exceedingly broad, requiring all charities in California to disclose donors to the government, even though there was no evidence that the donor information was useful to the government in furthering its stated interest in the disclosures. *See* 594 U.S. at 601, 613. In the more cabined context of disclosures relating specifically to electioneering communications, *Citizens United* rejected the plaintiffs' argument that disclosure would deter speech absent "evidence that its members may face similar threats or reprisals." 558 U.S. at 370; *see also Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 100 (1982) (relying on the lower court's finding of "a reasonable probability that disclosing the names of contributors and recipients will subject them to threats, harassment, and reprisals"). Here, Dinner Table presented no evidence that its small donors would be subject to threats or reprisals if their contributions were disclosed.

While Dinner Table complains that the Act's disclosure requirement limits the ability of its donors to "associate anonymously," Dinner Table Br. at 50, it fails to engage with Maine's cited caselaw endorsing disclosure requirements with either zero-dollar or very low-dollar minimums. See Maine Br. at 48–49 (*citing Citizens Against Rent*

*Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 300 (1981)) (endorsing a $0 minimum in dicta); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1251 (11th Cir. 2013) (upholding a $0 minimum); *Daggett*, 205 F.3d at 465 (upholding a $50 minimum); *Fam. PAC v. McKenna*, 685 F.3d 800, 809 (9th Cir. 2012) (upholding a $25 minimum). As these and other decisions hold, even where information about one specific small donation provides limited information, the data in the aggregate can still illuminate the sources of support for a candidate. *See Fam. PAC*, 685 F.3d at 810; *Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 41 (1st Cir. 2012).

Dinner Table's complaint that the Act sets a lower disclosure threshold for contributions to IEs that it does for other types of election spending also misses the mark. Dinner Table Br. at 51. Even under the rigors of strict scrutiny, a State "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee*, 575 U.S. at 449. Under the more relaxed scrutiny applicable to disclosure requirements, voters could properly prioritize requiring full transparency for super PAC contributions—a massive new conduit of money into U.S. elections that

23

has only arisen in the last 15 years—over other more traditional types of contributions.

Finally, Dinner Table offers no response to Maine's argument that, even if the disclosure requirements are unconstitutional as applied to Dinner Table, the district court erred by effectively striking down the requirement on a facial rather than as-applied basis. *See* Maine Br. at 50–52. Dinner Table has not shown that "a substantial number of [the disclosure requirements'] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Gaspee Project*, 13 F.4th at 93 (quoting *Americans for Prosperity Found.*, 594 U.S. at 614).

## III. Any portions of the Act determined to be unconstitutional should be severed.

Dinner Table does not contest Maine's argument that the disclosure requirement is severable from the contribution limit under Maine law. *See* Maine Br. at 52–53. Thus, the Court should direct the district court to narrow its injunction to the extent it rules that only one of the two provisions is invalid.

## Conclusion

For the foregoing reasons, and those stated in Maine's principal brief, the order of the district court granting judgment to Plaintiffs should be reversed and the case remanded with instructions to vacate the permanent injunction and enter judgment for Maine.

DATED:  January 30, 2026

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorney for Defendants-Appellants State Officials*

**Certificate of Compliance with Rule 32(a)**

1.     This brief contains 4,747 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Century Schoolbook type style.

<div style="margin-left:50%">

/s/ Jonathan R. Bolton
_____

JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorney for Defendants-Appellants*

</div>

**Certificate of Service Form
for Electronic Filing**

I hereby certify that on January 30, 2026, I electronically filed the

foregoing document with the United States Court of Appeals for the

First Circuit by using the CM/ECF system, which will send notification

of such filing to all counsel of record.

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov